**METRO MOBILE CTS, INC. and Metro Mobile CTS of Phoenix, Inc., Plaintiffs and Counterdefendants,**

v.

**NEWVECTOR COMMUNICATIONS, INC. and Newvector Retail Service, Inc., Defendants and Counterclaimants.**

**No. CIV 85–2109 PHX PGR.**

United States District Court, D. Arizona.

June 4, 1987.

R. Stephen Berry, Peter John Lesser, Fleischman & Walsh, P.C., Washington, D.C., Bruce P. White, Snell & Wilmer, Phoenix, Ariz., for plaintiffs and counterdefendants.

James R. Martin, Mark Erich Weber, Phillip H. Rudolph, Gibson, Dunn & Crutcher, Los Angeles, Cal., Michael M. Grant, Shimmel, Hill, Bishop & Gruender, P.C., Donald M. Peters, Meyer, Hendricks, Victor, Osborn & Maledon, Phoenix, Ariz., Joseph C. O'Neil, Bellevue, Wash., of counsel, for defendants and counterclaimants.

## MEMORANDUM AND ORDER

ROSENBLATT, District Judge.

### MEMORANDUM

### I. INTRODUCTION

Cellular telephone systems involve a new technology of mobile radio communication, based on a computer coordinated series of cell sites situated throughout the coverage area. Each cell site contains a radio transmitter which services a portion of the total coverage area. When a call is placed on or to a mobile cellular telephone, the system locates the telephone, establishes a connection through the appropriate cell site, and transfers that connection to other cell sites as the telephone moves through the area served by the system. The control and switching facilities of the cellular system are interconnected to the general telephone network.

The Federal Communications Commission (FCC) regulates the cellular industry.
See *Cellular Communications Systems,* 86 F.C.C.2d 469 (1981), *on reconsideration,* 89 F.C.C.2d 58, *on further reconsideration,* 90 F.C.C.2d 571 (1982). The FCC originally planned to license only one cellular provider per market, on the grounds that technical complexity and expense would make competing systems unviable. *See Land Mobile Radio Service,* 46 F.C.C.2d 752 (1974), *on reconsideration,* 51 F.C.C.2d 945, (1975), *clarified,* 55 F.C.C.2d 771 (1975). The FCC's decision to establish a monopoly in the wholesale cellular industry[1] was affirmed on appeal as a reasonable exercise of administrative discretion under section 303(g) of the Communications Act, 47 U.S.C. section 303(g). *National Ass'n of Regulatory Util. Comm'rs v. Federal Communications Comm'n,* 525 F.2d 630 (D.C.Cir.), *cert. denied,* 425 U.S. 992, 96 S.Ct. 2203, 48 L.Ed.2d 816 (1976) (*NARUC*). The *NARUC* court, however, expressed concern over the anticompetitive effects of the FCC's plan. *Id.* at 636–38. The FCC eventually reconsidered and decided that two competing systems would best serve the public interest. 86 F.C.C.2d at 476.

The radio frequencies allotted by the FCC for cellular systems would only accommodate two systems per market. *Id.* Nonetheless, the FCC found that "even the introduction of a marginal amount of facilities-based competition into the cellular market will foster important public benefits of diversity of technology, service and price...." *Id.* at 478. The FCC reserved, for a period of two years, one of the cellular licenses in each market for the carrier of traditional wireline telephone service in that market. *Id.* at 483; 89 F.C.C.2d at 70. The rationale for this allocation was that there existed a pressing need for cellular service, 86 F.C.C. at 489–90, and "only AT & T is in a position today to place cellular systems in operation around the country in the immediate future," *id.* at 489. The

[1]. The FCC anticipated the possible evolution of a highly competitive secondary market in the distribution of cellular service through resale. 86 F.C.C. at 476, 510. The FCC ordered that no restrictions on resale or shared use of cellular services would be permitted, and that the wire-line carriers were required to "provide system capacity to non-affiliated retailers or resellers on a non-discriminatory basis and on the same terms and conditions as its own distribution arm." *Id.* at 510–11.

other cellular license in each market was to be granted to a non-wireline carrier chosen through competitive bidding. *Id.* at 491. Because the wireline carrier would not likely be involved in the lengthy competition for a license, it would be able to provide cellular service to the market before the non-wireline carrier. In response to the concern that such a system would unduly favor the wireline carrier, the FCC found:

> [B]ecause of the great unsatisfied existing and potential demand for cellular service, it is unlikely that many markets will be unable to support two cellular systems. We also consider it unlikely that the advantage from an early entry into the market would be sufficiently significant to outweigh the need to grant immediate relief in markets....

*Id.* at 491 n. 57. The FCC agreed to consider a request for a delay in the wireline system if the non-wireline carrier could bear the "heavy burden of demonstrating that such action would be in the public interest." 89 F.C.C.2d at 75 n. 32. This FCC "head start" doctrine was upheld in *MCI Cellular Tel. Co. v. Federal Communications Comm'n,* 738 F.2d 1322, 1330–33 (D.C.Cir.1984). The FCC found that the prohibition on restrictions on the resale of cellular service would further ameliorate the effect of the head start:

> This prohibition is significant with respect to the headstart issue because it permits non-wireline entities to enter the cellular market, in a limited role, even before they obtain any license to provide cellular service. Thus, any carrier can establish a presence in the market through resale as soon as the wireline carrier begins operation, reducing the potential anticompetitive effect of early wireline entry.

89 F.C.C.2d at 74–75 n. 31.

Defendant NewVector Communications, Inc. (NewVector Wholesale) is a wholly owned subsidiary of U S West organized to provide wholesale cellular service in markets serviced by landline carriers affiliated with U S West. Defendant NewVector Retail Services, Inc. (NewVector Retail) is a wholly owned subsidiary of NewVector Wholesale organized for the purpose of providing retail cellular service in the Phoenix market. Both NewVector Wholesale and NewVector Retail will be referred to in this opinion as NewVector when a distinction between the two need not be made. Plaintiff Metro Mobile CTS, Inc. was formed to provide cellular service in several markets around the country. Metro Mobile CTS of Phoenix, Inc., a wholly owned subsidiary of Metro Mobile CTS, Inc., was formed to provide wholesale and retail cellular service in the Phoenix market.

The predecessor-in-interest of NewVector [2] applied to the FCC for the wireline construction permit for the Phoenix market in 1982. The construction permit was awarded in January 1983. In January 1984 NewVector applied to the FCC for the operating license. Metro Mobile sought a moratorium under the FCC's head start policies. Its petition was denied in August 1984 and NewVector then began providing wholesale and retail cellular service in the Phoenix market. Metro Mobile and other resellers, and agents affiliated with NewVector and the resellers, began to sell at retail cellular service purchased at wholesale from NewVector. In October 1984 Metro Mobile was awarded the non-wireline construction permit for the Phoenix market. After delays in getting its system operable, Metro Mobile began providing wholesale cellular service in March 1986.

Metro Mobile seeks damages and injunctive relief pursuant to sections 4 and 16 of the Clayton Act, 15 U.S.C. sections 15 and 26, for violations of section 2 of the Sherman Act, 15 U.S.C. section 2. This court has jurisdiction pursuant to 15 U.S.C. sections 15 and 26 and 28 U.S.C. sections 1331 and 1337.

Metro Mobile's First Amended Complaint (Complaint) alleges that NewVector monopolized the wholesale and retail markets for cellular telephone service in the Phoenix metropolitan statistical area. Metro Mobile

---

**2.** Advanced Mobile Phone Service, Inc. (AMPS) was to be the independent subsidiary of AT & T providing cellular service in all markets served by AT & T. After the divestiture of AT & T in 1984, AMPS also was divided into regional companies. NewVector Communications, Inc. is the successor-in-interest of AMPS in Phoenix.

has since withdrawn its claims regarding the retail market.[3] Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment (Response) at 18–20. The Complaint alleges that NewVector enjoyed monopoly power in the wholesale market during the seventeen month head start period. Metro Mobile alleges that NewVector engaged in six different exclusionary acts with the intent of maintaining that monopoly power:

(1) NewVector set its wholesale prices at a rate that would prevent other retail providers from competing with NewVector at retail. This "price squeeze" was intended to prevent Metro Mobile from building a customer base at retail, thereby preventing it from competing with NewVector at wholesale when it entered the wholesale market.

(2) NewVector engaged in disparagement and misrepresentation of Metro Mobile's intent and ability to provide wholesale service.

(3) NewVector Wholesale supplied to NewVector Retail Metro Mobile's trade secrets, gained by virtue of NewVector Wholesale's servicing of Metro Mobile's retail accounts during the headstart period. NewVector Retail then allegedly used this information in soliciting retail customers.

(4) NewVector Wholesale refused to place Metro Mobile's block of wholesale telephone numbers on its system, thus necessitating that all of Metro Mobile's retail customers had to change their phone numbers to switch to Metro Mobile's wholesale service after the headstart period.

(5) NewVector Wholesale compelled Metro Mobile to promote NewVector Retail's service during the headstart period by identifying the service as "Vector One" on all calls to Metro Mobile numbers that could not be completed. "Vector One" is the servicemark of NewVector.

(6) NewVector unlawfully obtained from Mountain Bell a list of Mountain Bell customers using mobile telephone service other than cellular.

NewVector has moved for summary judgment on two separate theories. NewVector first argues that its conduct is immune from antitrust liability under the state action immunity doctrine. Second, NewVector argues that as a matter of law it did not and cannot have monopoly power in the wholesale market.

## II. STATE ACTION IMMUNITY

The state action immunity doctrine was first articulated in the case of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). In *Parker* the Supreme Court held that the Sherman Act did not prevent the state of California from establishing a program that restricted competition among growers and maintained prices in the distribution of agricultural products. *Id.* at 350–352, 63 S.Ct. at 313–314. The Court found that absent clear Congressional intent to nullify a state's control over commerce within the state, principles of federalism and state sovereignty shield state officers and agents from antitrust liability for carrying out the laws of the state. *Id.* at 351, 63 S.Ct. at 313. The Court has extended the immunity announced in *Parker* to suits against private parties acting pursuant to state law. *Southern Motor Carriers Rate Conference v. United States*, 471 U.S. 48, 56–57, 105 S.Ct. 1721, 1726–1727, 85 L.Ed.2d 36 (1985). For state action immunity to apply, the defendant must show that the challenged restraint is "clearly articulated and affirmatively expressed as state policy," and that the policy is "actively supervised" by the state. *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980) (quoting *City of Lafayette v. Louisiana Power and Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978) (opinion of Brennan, J.)).

### A. Price Squeeze Allegation

#### 1. Clearly Articulated State Policy

NewVector relies principally on *Southern Motor Carriers* to support its argu-

---

**3.** Metro Mobile has not moved for leave to amend its Complaint pursuant to F.R.Civ.P. 15(a). Because it appears that NewVector would not oppose such a motion, the court will consider the claims involving the retail market abandoned for purposes of this motion.

ment that Arizona has a clearly articulated state policy to preempt competition with regulation as to cellular rates. In *Southern Motor Carriers* the Court considered the statutes of North Carolina, Georgia, Tennessee, and Mississippi which authorized rate bureaus composed of motor common carriers to submit joint rate proposals to the Public Service Commissions in each state. *Southern Motor Carriers*, 471 U.S. at 50–51, 105 S.Ct. at 1723–1724. Individual carriers remained free to submit individual rate proposals. *Id.* at 51, 105 S.Ct. at 1723. If no action was taken by the agency within a certain period of time, the proposed jointly-set rate became effective. *Id.* at 50–51, 105 S.Ct. at 1723. The United States sued the rate bureaus, contending that the collective ratemaking violated Section 1 of the Sherman Act. *Id.* at 52–53, 105 S.Ct. at 1723.

The Supreme Court held that the state policy need not compel the anticompetitive activity: "The federal antitrust laws do not forbid the States to adopt policies that permit, but do not compel, anticompetitive conduct by *regulated* private parties." *Id.* at 60, 105 S.Ct. at 1728 (emphasis in original). Thus, the statutes, which permitted joint ratemaking while also providing for individual rate submissions, were found to evidence the intention of the states to "achieve the desired balance between the efficiency of collective ratemaking and the competition fostered by individual submissions." *Id.* at 59–60, 105 S.Ct. at 1728. The Court expressed its clear desire to allow the states to adopt whatever provisions they deem necessary to carry out their regulatory policies.

The statutes of North Carolina, Georgia, and Tennessee expressly permitted collective ratemaking by common carriers. *Id.* at 62, 105 S.Ct. at 1729. The Court held that such a statutory expression amounted to a clearly articulated state policy. *Id.* at 63, 105 S.Ct. at 1730. The Mississippi statute did not expressly approve ratesetting; it simply provided that the Public Service Commission prescribe just and reasonable rates for common carriers. *Id.* at 63–64, 105 S.Ct. at 1730. The commission then exercised its discretion in actively encouraging ratemaking. *Id.* at 64, 105 S.Ct. at 1730. The Court held that there need not be specific, detailed legislative authorization for the challenged conduct. *Id.* The first prong of *Midcal* is satisfied "as long as the State as sovereign clearly intends to displace competition in a particular field with a regulatory structure...." *Id.* The state can leave the implementation of the policy to displace competition to regulatory agencies. *Id.* at 64–65, 105 S.Ct. at 1730–1731.

The Arizona Constitution requires the Arizona Corporation Commission (ACC) to:

prescribe just and reasonable classifications to be used and just and reasonable rates and charges to be made and collected, by public service corporations within the State for service rendered therein, and make reasonable rules, regulations, and orders, by which such corporation shall be governed in the transaction of business within the State.

Ariz.Const. art. XV, section 3. It is undisputed that NewVector Wholesale is a public service corporation subject to regulation by the ACC. The Arizona Revised Code (A.R.S.) also provides that "charges demanded or received by a public service corporation for any commodity or service shall be just and reasonable." A.R.S. section 40–361(A). The ACC may "supervise and regulate every public service corporation in the state and do all things, whether specifically designated in this title or in addition thereto, necessary and convenient in the exercise of such power and jurisdiction." A.R.S. section 40–202(A). The Code further provides:

When the commission finds that the rate, fares, tolls, rentals, charges or classifications, or any of them, demanded or collected by any public service corporations for any service, product or commodity, or in connection therewith, or that the rules, regulations, practices, or contracts, are unjust, discriminatory or preferential, illegal or insufficient, the commission shall determine and prescribe them by order, as provided in this title.

A.R.S. section 203.

The Arizona constitutional and statutory scheme clearly and affirmatively sets forth

a policy to displace competition with regulation as to public service corporations. The directive to the ACC to determine just and reasonable rates and charges falls squarely within the analysis of *Southern Motor Carriers,* 471 U.S. at 63–64, 105 S.Ct. at 1730. By definition, just and reasonable rates are set by regulatory agency, not by the market. *Id.* at 59–60, 105 S.Ct. at 1728. As in *Southern Motor Carriers,* the regulatory agency, the ACC, is given wide discretion in how to implement the constitutional and legislative directive.

■ Metro Mobile argues that as part of the clearly articulated and affirmatively expressed policy prong of the state action immunity test, NewVector must show that the state as sovereign clearly sanctions or clearly contemplates the specific anticompetitive conduct in question. In other words, the Arizona Constitution or statutes must clearly articulate and affirmatively express a policy to sanction price squeezes, disparagement, and the other allegedly anticompetitive acts listed by Metro Mobile in its Complaint. This kind of precise contemplation by the state as sovereign is not necessary. The Supreme Court made very clear in *Southern Motor Carriers* that the state as sovereign need only make clear its intent to replace competition with regulation. *Id.* at 64, 105 S.Ct. at 1730. The Court stated that "[a] private party acting pursuant to an anticompetitive regulatory program need not 'point to a specific, detailed legislative authorization' for its challenged conduct." *Id.* (quoting *City of Lafayette,* 435 U.S. at 415, 98 S.Ct. at 1138 (opinion of Brennan, J.)). Further: "Agencies are created because they are able to

deal with problems unforeseeable to, or outside the competence of, the legislature. Requiring express authorization for every action that an agency might find necessary to effectuate state policy would diminish, if not destroy, its usefulness." *Id.*[4] As discussed above, both the Arizona Constitution and statutes require the ACC to set "just and reasonable rates." This clear intent to replace competition with regulation satisfies the first prong of the *Midcal* test.

As discussed above, the basis of Metro Mobile's anticompetitive pricing claim, the price squeeze, is that NewVector set its wholesale rates so high in relation to retail rates that resellers could not possibly make a profit. The alleged intention of this pricing practice was to prevent Metro Mobile from building up a customer base at retail that would support its wholesale system when it became operable, thus ultimately driving Metro Mobile out of the wholesale market. Metro Mobile argues that *Parker* immunity only shields NewVector's price squeeze from the Sherman Act if Arizona has a clearly articulated state policy specifically to regulate the margin between wholesale costs and retail prices. Metro Mobile argues that the State of Arizona has authorized the ACC to regulate only public service corporations, that only New-Vector Wholesale and not NewVector Retail is a public service corporation, and that therefore the state has not authorized regulation of retail prices or of the margin between wholesale and retail rates.

It is undisputed that the ACC has not accepted jurisdiction over NewVector Re-

---

**4.** NewVector argues that the clear contemplation test applies only when *Parker* immunity is sought by a municipality. In *Town of Hallie v. City of Eau Claire,* the Court reaffirmed the language set forth in *City of Lafayette,* 435 U.S. at 415, 98 S.Ct. at 1133, requiring a showing that the legislature contemplated the kind of action complained of. *Town of Hallie,* 471 U.S. 34, 44, 105 S.Ct. 1713, 1719, 85 L.Ed.2d 24 (1985). The Court also stated, however, that "[i]t is not necessary ... for the state legislature to have stated explicitly that it expected the City to engage in conduct that would have anticompetitive effects." *Id.* at 42, 105 S.Ct. at 1718. It is satisfactory that the anticompetitive effects are "a foreseeable result" and "logically would result" from

the authority to regulate granted to the municipality. *Id.* These added factors, not mentioned in *Southern Motor Carriers,* presumably compensate for the fact the active state supervision requirement of *Midcal* does not apply in cases involving municipalities, *id.* at 46, 105 S.Ct. at 1720. In addition, the Ninth Circuit has held that "executive agencies [unlike cities] ... are entitled to *Parker* immunity for actions taken pursuant to their constitutional or statutory authority, regardless of whether these particular actions or their anticompetitive effects were contemplated by the legislature." *Charley's Taxi Radio Dispatch v. SIDA of Hawaii,* 810 F.2d 869, 876 (9th Cir.1987).

tail, and has not attempted to regulate retail cellular rates.[5] This fact alone does not support Metro Mobile's argument for several reasons. First, the clear language of the Arizona statutes requires the ACC to consider whether "rates ... demanded or collected by any public service corporation for any service ... [or] rules, regulations, practices or contracts, are unjust, discriminatory or preferential, illegal or insufficient...." A.R.S. section 40-203. Such a broad mandate carries with it the power and indeed the responsibility to examine all aspects of a proposed tariff, including aspects that affect an unregulated market. A rate can be unjust, discriminatory, preferential, illegal, or insufficient because of its effect on areas outside the jurisdiction of the ACC. It is axiomatic that the determination of a just and reasonable rate depends in great part upon the effect of the rate on the ratepayer. *See, e.g., Salt River Valley Canal Co. v. Nelssen,* 10 Ariz. 9, 13, 85 P. 117, 119 (1906); *cf. Federal Power Comm'n v. Conway Corp.,* 426 U.S. 271, 278–80, 96 S.Ct. 1999, 2004–2005, 48 L.Ed.2d 626 (1976) (Federal Power Commission [now the Federal Energy Regulatory Commission] has jurisdiction, pursuant to its duty under 16 U.S.C. section 824e(a) to establish electric power rates which are "just and reasonable," to consider the allegations of the wholesale customers of a power company that sells electricity at both wholesale and retail that the proposed wholesale rates, within the Commission's jurisdiction, are discriminatory and noncompetitive when considered in relation to the company's retail rates, which are not within the Commission's jurisdiction.) The ACC had the power to adjust NewVector's wholesale rates so as to prevent a margin between wholesale costs and retail prices that would be unjust, discriminatory, preferential, or illegal as to resellers.

▪ In addition, the record shows that the ACC did in fact consider the effect of the wholesale tariff on the retail market, including the question of insufficient margin between wholesale costs and retail

prices as it applied to resellers. Metro Mobile and Comven both submitted letters to the ACC's Hearing Officer, after the hearing on NewVector's tariff, which outlined their objections to the wholesale tariff in relation to the retail market. Comven's letter of May 14, 1984 advises the ACC that Comven had intended to resell NewVector service, but reconsidered and decided not to become a reseller after reviewing the proposed wholesale tariff. NewVector's Exhibits in Support of NewVector's Motion for Summary Judgment on Metro Mobile's Claims (NewVector Exs.) Vol. II, Ex. 26. The letter states:

> Comven respectfully requests the following:
>
> 1. Modify the proposed tariff in a manner to enable unaffiliated resellers to provide service. As noted above, under the current proposal an independent, nonsubsidized reseller cannot operate at a profit.
>
> * * * * * *
>
> We believe that operating approval for New Vector [sic] should not be granted unless the tariff is structured to permit independent resellers to participate. The public will benefit through competitive activity of unaffiliated resellers in the marketplace. Only New Vector [sic] will benefit from the proposed tariff.

*Id.* The June 6, 1984 letter from Metro Mobile to the ACC supplements the concern expressed by Comven as to the profitability of independent resellers, and also raises an objection to the volume discount provision in the NewVector tariff. *Id.* at Vol. II, Ex. 25. In its Opinion and Order in Docket No. U–2416–83–100, Decision No. 54122, (July 19, 1984), which modified in part and approved in part NewVector's proposed tariff, the ACC acknowledged the objection that "the proposed rates give an unfair advantage to NewVector's retail subsidiary." *Id.* at Vol. II, Ex. 27. The ACC found that the volume discounts would provide NewVector Retail with an unfair and unwarranted advantage, and or-

---

5. The ACC has not yet determined whether NewVector Retail and other retailers of cellular service are public service corporations subject to

regulation by the ACC. *In re Application of AMPS,* Docket No. U–2416–83–100 at 5 (July 19, 1984).

dered that provision struck from the tariff. *Id.* at Vol. II, Ex. 27, pp. 5–6. The ACC then stated:

> We find no other portions of NewVector's proposed rates and charges which present any *immediate* problem. Consequently, we believe that with the changes mentioned hereinabove, these tariffs provide a reasonable basis upon which to begin this new venture into cellular telephone service. Should actual experience in this business prove to us that the precautions ordered in this instance were unnecessary or that additional restrictions and regulation are warranted, we have ample authority to modify our decision herein.

*Id.* at pg. 6 (emphasis in original). In its Findings of Fact, the ACC stated: "There has been no evidence that NewVector will operate under its proposed tariffs in such a manner as to foreclose meaningful opportunities, for independent resale of cellular telephone service." *Id.* at pg. 7. This evidence shows that the ACC interpreted its constitutional and statutory mandate to include consideration of the effect of the wholesale tariff on the unregulated retail market. An agency's interpretation of a statute or regulation which it implements is ordinarily entitled to great weight. *Marlar v. State,* 136 Ariz. 404, 411, 666 P.2d 504, 511 (App.1983). Further, the record shows that the ACC considered and rejected the very price squeeze issue alleged in this antitrust action.

The Arizona statutory scheme provides for appeals of rulings of the ACC. *See* A.R.S. section 40–254(A) ("Any party in interest ... being dissatisfied with any order or decision of the commission, may ... commence an action ... to vacate ... such order or decision on the grounds that ... [it] is unlawful, or that any regulation,

practice, act or service provided in the order is unreasonable.") Metro Mobile could have appealed on the grounds alleged here, that the ACC had no jurisdiction over any aspects of the retail market. It could also have appealed the decision of the ACC to approve the tariff on the grounds that the rates were unlawful or unreasonable because of the effect on the retail market. It did not do so.

The factual circumstances of this case are different from those in most state action immunity cases. The ACC did not mandate the anticompetitive conduct. Nor did it permit it in the sense that the regulations at issue in *Southern Motor Carriers* expressly permitted collective ratemaking.[6] Neither the Arizona legislature nor the ACC made an express determination that an anticompetitive price squeeze would further the economic policy of the state. At issue in this case is not the overarching regulation of wholesale cellular service, but a detail in the implementation of the regulatory scheme. As the Supreme Court held in *Southern Motor Carriers,* the state as sovereign may leave the details of regulation to an administrative agency. *Southern Motor Carriers,* 471 U.S. at 64, 105 S.Ct. at 1730. The distinction between an agency establishing an encompassing policy of price fixing, as in *Southern Motor Carriers,* and an agency expressly determining that a specific tariff is just and reasonable even in light of complaints that the tariff will lead to an anticompetitive price squeeze, is a distinction without substance for purposes of state action immunity analysis. The details of the everyday application of the state's mandate to regulate, as applied by the regulatory agency, are the muscle of the regulatory scheme.

---

6. *See, e.g., Midcal,* 445 U.S. at 99, 100 S.Ct. at 940 (California Code expressly required wine retailers to sell wine at a price set in fair trade contracts or price schedules established by producers, wholesalers, and rectifiers); *New Motor Vehicle Board of California v. Orrin W. Fox, Co.,* 439 U.S. 96, 98, 99 S.Ct. 403, 406, 58 L.Ed.2d 361 (1978) (California law required a motor vehicle manufacturer to secure approval of a state agency before opening a retail dealership within the same area as an existing franchisee); *Bates v.*

*State Bar of Arizona,* 433 U.S. 350, 355, 97 S.Ct. 2691, 2694, 53 L.Ed.2d 810 (1977) (rule of Arizona Supreme Court expressly prohibited advertising by lawyers); *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 776–77, 95 S.Ct. 2004, 2007–08, 44 L.Ed.2d 572 (1975) (County Bar Association published a minimum fee schedule for lawyers); *Parker,* 317 U.S. at 346–48, 63 S.Ct. at 311–12 (California statute required formulation of proration marketing program for various commodities).

The Supreme Court considered a similar "detail" of regulation in *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976). Detroit Edison (Edison) was pervasively regulated by the Michigan Public Service Commission (MPSC). *Id.* at 581, 96 S.Ct. at 3113. Edison's tariff for the distribution of electricity included a program in which it distributed light bulbs to its customers with no separate charge for the light bulbs. *Id.* at 582, 96 S.Ct. at 3113. The tariff was approved by the Commission and could not be changed by Edison without the Commission's approval. *Id.* at 582–83, 96 S.Ct. at 3113–14. Edison was sued by a retailer of light bulbs who claimed that Edison used its regulated monopoly in the market for distribution of electricity to restrain competition in the unregulated market for the distribution of electric light bulbs. *Id.* at 582–83, 96 S.Ct. at 3113–14. The Court held that state action immunity did not apply even though the Commission approved the tariff which included the anticompetitive light bulb distribution program. *Id.* at 592–98, 96 S.Ct. at 3118–21. The facts of *Cantor* are similar enough to this case to warrant consideration of it as precedent.

The court does not consider *Cantor* to be persuasive authority in this instance for several reasons. First, the opinion relied heavily on the concept that the anticompetitive conduct must be compelled by the state for immunity to apply. *Id.* at 592–95, 96 S.Ct. at 3118–19 (see also plurality opinion at 600–01, 96 S.Ct. at 3112). The court held that since Edison exercised freedom of choice in deciding to continue the light bulb program, immunity did not apply. *Id.* at 593–95, 96 S.Ct. at 3118–19. The compulsion requirement was clearly rejected in *Southern Motor Carriers*, 471 U.S. at 60–62, 105 S.Ct. at 1728–29. Second, the majority also relied on the concept that for immunity to apply the immunized anticompetitive conduct must be "necessary in order to make the regulatory Act work, 'and even then only to the minimum extent necessary.'" *Cantor*, 428 U.S. at 597, 96 S.Ct. at 3121 (citation omitted). Since "Michigan's interest in regulating its utilities' distribution of electricity will be almost entirely unimpaired" if the light bulb program is subject to antitrust laws, the Court held that immunity did not apply. *Id.* at 596–98, 96 S.Ct. at 3120–21. The "necessity" test for state action immunity was also clearly rejected in *Southern Motor Carriers*. *Southern Motor Carriers*, 471 U.S. at 57–58 n. 21, 105 S.Ct. at 1738 n. 21 (referring to the *Cantor* language as "questionable *dictum*"). Finally, the *Cantor* Court held that "[n]either the Michigan Legislature, nor the Commission, has ever made any specific investigation of the desirability of a lamp-exchange program or of its possible effect on competition in the lightbulb market." *Cantor*, 428 U.S. at 584, 96 S.Ct. at 3115. As noted above, the ACC considered, and rejected, the specific question of the effect of NewVector's wholesale rates on the cellular resale market before approving NewVector's tariff.

Metro Mobile cites the case of *City of Mishawaka v. Indiana & Michigan Elec. Co.*, 560 F.2d 1314 (7th Cir.1977), *cert. denied*, 436 U.S. 922, 98 S.Ct. 2274, 56 L.Ed.2d 765 (1978) (*Mishawaka I*), in support of its argument that a price squeeze cannot be protected by the state action immunity doctrine when only one side of the market is regulated by the state. The city of Mishawaka, Indiana and several other Indiana and a Michigan municipalities purchased power from the Indiana and Michigan Electric Company (IMEC) at wholesale and then distributed it to retail customers. *Id.* at 1316. IMEC also delivered power directly to its own retail customers. *Id.* The municipalities sued IMEC alleging price squeeze monopolization and attempted monopolization of the retail market on the grounds that the wholesale price IMEC charged them was higher than the retail price IMEC charged its own retail customers. *Id.* IMEC's wholesale rates were regulated by the Federal Power Commission and its retail rates were regulated by the Indiana and Michigan Public Service Commissions. *Id.* at 1317.

*Mishawaka I* does not apply to the case before the court for several reasons. First, *Mishawaka I* is primarily an exclusive jurisdiction case rather than a state action immunity case. Indeed, any discussion of state action immunity is found in the sec-

**1514**

tion of the opinion labeled "Exclusive Jurisdiction." *See id.* at 1318–21. Although the opinion does include a discussion of the *Cantor* opinion, it appears that the state action immunity question was not even raised by IMEC. The opinion states:

> The state commissions of Indiana and Michigan are not alleged to have any power to regulate the price squeeze in any sense. Since this conduct is not being regulated by the state commission, Sherman Act jurisdiction of course is not ousted in favor of state regulation. The defendant does not contend otherwise.

*Id.* at 1320 n. 7. It is understandable that the court in *Mishawaka I* would have discussed exclusive jurisdiction and state action immunity concurrently because at the time the standards were very similar. Both required that the challenged anticompetitive actions be necessary to the regulatory scheme before immunity would apply. The Supreme Court has expressly overruled the language in *Cantor* applying the necessity factor, noting that it only applies in exclusive jurisdiction analysis. *Southern Motor Carriers*, 471 U.S. at 57–58 n. 21, 105 S.Ct. at 1738 n. 21. Thus, the analysis in *Mishawaka I*, to the extent that it is an analysis of state action immunity, is suspect in its reliance on *Cantor's* necessity requirement. *Mishawaka I* is also factually distinguishable. The Seventh Circuit found that "the state commissions have in no way placed a badge of approval on the defendant's dual rate structure." *Mishawaka I* 560 F.2d at 1320; *see also City of Mishawaka v. American Electric Power Co.*, 616 F.2d 976, 985 (7th Cir.1980), *cert. denied*, 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824 (1981) (*Mishawaka II*). As discussed above, the ACC did consider Metro Mobile's price squeeze argument in approving NewVector's wholesale tariff.

Metro Mobile also cites *City of Kirkwood v. Union Elec. Co.*, 671 F.2d 1173 (8th Cir.1982), *cert. denied*, 459 U.S. 1170, 103 S.Ct. 814, 74 L.Ed.2d 1013 (1983). The factual setting in *Kirkwood* is, for purposes of this analysis, identical to that in *Mishawaka I*. The *Kirkwood* court did address the state action question separate from the exclusive jurisdiction issue. It also relied heavily on language from *Can-*

*tor* that has since been refuted by the Supreme Court. *Id.* at 1180. In examining the first prong of the *Midcal* test, the *Kirkwood* court stated that the legislative policy of the state does not authorize or encourage anticompetitive activity because the state regulatory body is required to "seek out and eliminate discriminatory prices." *Id.* Under *Southern Motor Carriers*, this kind of legislative mandate would be sufficient to pass the first *Midcal* prong. The language also suggests that the *Kirkwood* court felt that the regulatory agency had not done its job in seeking out and eliminating discriminatory prices because it had not intercepted the price squeeze. As discussed below, this type of analysis is improper in considering state action immunity. In discussing the second *Midcal* prong, the *Kirkwood* court held that the state agency did not have authority over the interrelation of the wholesale and retail rates. Again, this case is distinguishable because here the ACC did assert authority over that interrelationship as it affected a determination of just and reasonable wholesale rates. The case of *Borough of Ellwood City v. Pennsylvania Power Co.*, 462 F.Supp. 1343 (W.D.Pa. 1979), also cited by Metro Mobile, is similarly legally and factually distinguishable.

Metro Mobile argues that the regulatory policy of the State of Arizona as it is defined by the ACC is intended to foster competition rather than to replace competition with regulation. It argues that the ACC has allowed NewVector to establish in its tariff a rate band for wholesale prices, and that movement within the rate band reflects the effect of competition. This argument is not persuasive for several reasons. First, as a matter of law, a state regulatory scheme need not be antithetical to competition to be exempt from federal antitrust scrutiny. The Supreme Court held that states may strike a balance between regulation and competition that best furthers its economic policy. *Southern Motor Carriers*, 471 U.S. at 59, 105 S.Ct. at 1728. State action immunity analysis must be contrasted with exclusive jurisdiction analysis. As to the latter, the analysis focuses on whether a later enacted statute

evidences implied Congressional intent to repeal the antitrust laws. *See, e.g., Silver v. New York Stock Exchange,* 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963). Since implied repeals are disfavored, they are to be implied only when necessary to make the subsequent act work, and then only to the minimum extent necessary. *Id.* There must be a "convincing showing of clear repugnancy between the antitrust laws and the regulatory system." *United States v. National Ass'n of Sec. Dealers,* 422 U.S. 694, 719–20, 95 S.Ct. 2427, 2442–43, 45 L.Ed.2d 486 (1975). The theoretical underpinnings of state action immunity, federalism and the sovereignty of the states, require a more lenient analysis. As the Supreme Court stated in *Southern Motor Carriers:* "[I]f the federal courts wrongly conclude that an antitrust exemption is 'unnecessary,' Congress can correct the error.... [H]owever, the Supremacy Clause would prevent state legislatures taking similar remedial action." *Southern Motor Carriers,* 471 U.S. at 57–58 n. 21, 105 S.Ct. at 1727 n. 21. The state need only have a policy to replace unfettered competition with regulation; the regulatory scheme need not be repugnant to the goals of the antitrust laws, nor need it completely oust principles of competition. *Id.* at 59–60, 105 S.Ct. at 1728.

█ In *McCaw Personal Communications, Inc. v. Pacific Telesis Group,* 645 F.Supp. 1166 (N.D.Cal.1986), the court held that a decision by the California Public Utility Commission (PUC) approving an acquisition as "in the public interest" was not entitled to state action immunity. *Id.* at 1172. The court held that because the public interest standard applied by the PUC contained consideration of antitrust principles (although not enough to warrant a finding of collateral estoppel as to the antitrust claim, *id.*), the state's intention was to foster rather than displace competition. *Id.* The court stated: "To the extent the State as sovereign has expressed an opinion at all, it is merely to ensure that such acquisitions are in the public interest." *Id.* This court declines to follow the analysis of *McCaw.* A ruling by a regulatory body based on the state's public policy, which clearly includes factors other than enhanc-

ing competition, displaces competition within the meaning of *Southern Motor Carriers.* The Supreme Court was clear that consideration of competition in the regulatory scheme does not destroy state action immunity. *Southern Motor Carriers,* 471 U.S. at 59, 105 S.Ct. at 1728. The Court's discussion of the compulsion requirement is germane:

> The *Parker* doctrine represents an attempt to resolve conflicts that may arise between principles of federalism and the goal of the antitrust laws, unfettered competition in the marketplace. A compulsion requirement is inconsistent with both values. It reduces the range of regulatory alternatives available to the State. At the same time, insofar as it encourages States to require, rather than merely permit, anticompetitive conduct, a compulsion requirement may result in *greater* restraints on trade. We do not believe that Congress intended to resolve conflicts between two competing interests by impairing both more than necessary.

*Id.* at 61, 105 S.Ct. at 1729 (emphasis in original). Likewise, if inclusion of antitrust principles of competition as a part of a state's public policy prevents the state from enforcing its policy outside the constraints of the antitrust laws, states will be inclined to eliminate antitrust goals in favor of other state economic goals.

Another reason that Metro Mobile's argument that Arizona's regulatory policy fosters rather than replaces competition with regulation is unpersuasive is that the ACC is required actively to review wholesale rates. It must approve the rate band initially, A.R.S. section 40–203; proposed changes in rates within the rate band are not automatic, but are subject to review by the ACC, *id.* at sections 40–250, –367; and the ACC retains jurisdiction to review the reasonableness of the tariff itself, *id.* at section 40–203 et. seq. As long as an agency is under the mandate of a sovereign state to establish just and reasonable rates, and retains discretion as to how those rates will be determined, the method by which it establishes those rates is, and remains, regulation, even if one of the factors used in

determining the just and reasonable rates is the effect of competition.

■ In *Southern Motor Carriers* the Court suggested, in *dicta,* that if a state agency were authorized to choose free-market competition as its mode of regulation, state action immunity would not apply. *Southern Motor Carriers,* 471 U.S. at 65 n. 25, 105 S.Ct. at 1731 n. 25. The Court noted that the Mississippi Public Service Commission was required to prescribe rates based on statutorily enumerated factors.[7] *Id.* The Court found that "[t]hese factors bear no discernible relationship to the prices that would be set by a perfectly efficient and unregulated market." *Id.* This court finds that the constitutional and statutory mandate that the ACC prescribe just and reasonable rates is enough in and of itself to satisfy the first prong of *Midcal.* It is not the province of the federal courts to question the state's determination of how a rate is determined to be just and reasonable. So long as the state as sovereign has exercised the power to regulate, has established the method by which it will execute its policy to regulate, and retains the power to alter that method, it does not forfeit that power by introducing competition into the regulation. Footnote 25 of the *Southern Motor Carriers* opinion should be read as an illustration of how Mississippi indicated its intent to replace competition with regulation rather than as a model of what is necessary for another state to exempt its regulatory program from the strictures of the federal antitrust laws.[8]

---

7. In the exercise of its power to prescribe just and reasonable rates ... the commission shall give due consideration, among other factors, to the inherent advantages of transportation by such carriers; to the effect of rates upon the movement of traffic by such carriers; to the need, in the public interest, of adequate and efficient transportation service by such carriers at the lowest cost consistent with the furnishing of such services; and to the need of revenues sufficient to enable such carriers, under honest, economical, and efficient management, to provide such service.
Miss.Code Ann. section 77-7-221.

8. The situation in *Community Communications Co. v. City of Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982) is distinguishable. In

Even if footnote 25 of *Southern Motor Carriers* is read to require the state's economic policy to include factors other than competition, the Arizona regulatory scheme satisfies that standard. The Arizona Constitution requires the ACC, "to aid it in the proper discharge of its duties, [to] ascertain the fair value of the property within the State of every public service corporation doing business therein...." Ariz. Const. Art. 15, section 14. The ACC must engage in fair value rate base analysis in the setting of fair and reasonable rates. *Simms v. Round Valley Light and Power Co.,* 80 Ariz. 145, 151, 294 P.2d 378, 381 (1956); *Arizona Corp. Comm'n v. Citizen's Util. Co.,* 120 Ariz. 184, 188, 584 P.2d 1175, 1179 (App.1978); *Scates v. Arizona Corp. Comm'n,* 118 Ariz. 531, 534, 578 P.2d 612, 615 (App.1978); *Morris v. Arizona Corp. Comm'n,* 24 Ariz.App. 454, 457, 539 P.2d 928, 931 (1975). Although the ACC has broad discretion in establishing rates, and can consider numerous factors, it must consider the value of the utility's property within the state in setting a just and reasonable rate. *Scates,* 118 Ariz. at 534, 578 P.2d at 615. In addition, in determining what is a just and reasonable rate, the effect of the rate on customers is as important as the effect on the profits of the public service corporation. *Nellsen,* 10 Ariz. at 13, 85 P.2d at 119 (1906). Thus, the ACC must consider factors other than "what the market will bear" when determining just and reasonable rates.

In its consideration of NewVector's wholesale tariff, the ACC initially deferred

---

*Boulder* the state constitution established "home rule" which gave municipalities extensive powers of self-government. *Id.* at 43-44, 102 S.Ct. at 836. The broad powers allowed municipalities to elect free market competition as an alternative to regulation as to the cable television industry at issue in the case. *Id.* at 56, 102 S.Ct. at 843. The Supreme Court held that anticompetitive actions on the part of the city were not protected by state action immunity because the state as sovereign had not expressed a policy to displace competition with regulation. The policy decision was made by the city, not the state. As discussed above, the State of Arizona has expressed a policy that rates of public service corporations are to be just and reasonable as determined by the ACC.

consideration of rate of return and cost of service analysis:

> The Commission has never required a cost of service justification for the rates charged by a newly certificated utility or for a newly instituted service. In this instance, we have a recently organized business entity engaging in a line of business which has never been commercially practiced anywhere in the world, using a new form of technology. It is grossly unfair for Staff to demand the impossible. It is only after NewVector has some actual experience under its belt that meaningful cost of service data will be available.

NewVector Exs., Vol. II, Ex. 27, pg. 4. In ordering final approval of NewVector's tariff in August 1986, the ACC stated:

> The Commission has received no complaints concerning the rates charged by NewVector, and with the existence of competition from a non-wireline cellular provider (not to mention the competition from resellers of cellular service), there is less likelihood that we will receive any such complaints in the future. While Staff has argued that a full "rate of return on rate base" review is "moot", we believe that it should more properly be characterized as unnecessary. NewVector is seeking no increase in its rates and charges. When such an increase is requested, we shall carry out our responsibilities under Article XV, Section 14 of the Arizona Constitution. Until then, we see little purpose in subjecting a clearly competitive service to a meaningless analysis of its "fair value".

*Id.* at Vol. II, Ex. 31, pg. 2. Whether the ACC abused its discretion under the Arizona Constitution and statutes by not subjecting NewVector's wholesale tariff to cost of service and rate of return analysis is, as discussed below, for the Arizona courts, not the federal courts, to determine. A

dereliction by the ACC of its duty under the Arizona regulatory scheme does not compel the conclusion that the scheme does not exist. As noted above, the Arizona regulatory scheme provides for judicial review of errors of the ACC.[9] In addition, Metro Mobile does not challenge the wholesale rates per se, but only their effect on the margin between wholesale costs and retail prices. The ACC considered and rejected that specific issue. Rate of return and cost of service analysis, and wholesale cost/retail price squeeze, are separate factors to be considered in determining whether wholesale rates are just and reasonable.[10]

The Arizona statutes provide that the ACC can order complete or partial deregulation as to any product, market, or service of a telecommunications corporation upon a finding that effective competition exists. A.R.S. section 40–281(E). NewVector Wholesale is a telecommunications corporation. The statute lists several criteria to be used by the ACC in determining whether effective competition exists as to any particular product, market, or service, including whether deregulation will promote adequate service at just and reasonable rates and whether deregulation is in the public interest. *Id.* This provision does not vitiate the clearly articulated state policy to replace competition with regulation. The criteria used to determine whether "effective competition" exists are themselves regulatory criteria. If the rates charged after deregulation are not just and reasonable or if the effects of the deregulation are found not to be in the public interest, the ACC can reconsider its decision and "reregulate" the product, market, or service. This ongoing oversight based on concepts of justness, reasonableness, and public policy is still regulation. In addition, the statute does not provide for complete

---

9. It is understandable that Metro Mobile did not challenge the ACC's failure to subject NewVector's wholesale tariff to fair value cost justification. As an imminent wholesale provider itself, Metro Mobile likely did not want fair value analysis of its tariff.

10. Further, once Metro Mobile began to offer wholesale cellular service, the price squeeze issue became moot because of the competition in the wholesale market. As such, the ACC's failure to subject NewVector's tariff to cost of service and rate of return analysis in August 1986, after Metro Mobile entered the wholesale market, is irrelevant to the issue of price squeeze raised in this action.

deregulation of telecommunication corporations, but only specific products, markets, or services. There is a distinction for state action immunity purposes between non-regulation and the limited "deregulation" of section 40–281(E).[11]

In summary, the constitution and statutes of Arizona clearly articulate a state policy to replace competition with regulation, as articulated in *Southern Motor Carriers,* as to public service corporations such as NewVector Wholesale. The ACC has interpreted its mandate to authorize only just and reasonable wholesale cellular rates to include consideration of the effect of the regulated wholesale rates on the unregulated retail market. Further, the ACC determined that despite the concerns of Metro Mobile and others, NewVector's wholesale tariff was just and reasonable. The actions of the ACC lead to the conclusion that the State of Arizona has, as a matter of state economic policy, approved NewVector's wholesale tariff as well as its effect on the margin between wholesale costs and retail prices of cellular service.

### 2. Active Supervision

The Arizona statutes establish a comprehensive procedural scheme for implementing the regulatory program for public service corporations. First, the ACC has the power to investigate and collect evidence. It can require public service corporations to furnish to it, *inter alia,* tabulations, computations, annual reports, monthly or periodical reports of earnings and expenses, contracts, papers and records, and all other information relating to or affecting the corporation's business. A.R.S. section 40–204(A) and (B). It can inspect the accounts, books, papers and documents of any public service corporation at any time, and can examine under oath any officer, agent or employee of a public service corporation in relation to the business and affairs of the corporation. *Id.* at section 40–241(A).

Second, the ACC has adjudicatory powers. It has the power to initiate complaints, or to hear complaints made by any person, alleging violation of any provision of law or any order or rule of the commission. *Id.* at section 40–246(A). The ACC is required to hold hearings, has the power to enforce attendance of witnesses, and is required to make and file an order containing its decision. *Id.* at section 40–247(A) and (B). The ACC must review all proposed rates or rate increases to determine whether they are just and reasonable, and must modify proposed rates to make them just and reasonable *Id.* at section 40–250. The ACC has the power to rescind, alter, or amend any of its orders or decisions. *Id.* at sections 40–252, –253, –254.

Third, the ACC has enforcement powers. The ACC is empowered to "do all things, whether specifically designated in this title or in addition thereto" in carrying out its duties, *id.* at section 40–202(A), and public service corporations are required to comply with the rulings of the ACC, *id.* at section 40–202(B). The ACC can mandate certain record keeping and accounting methods for public service corporations. *Id.* at section 40–221. Upon a finding that a public service corporation has made an excessive or discriminatory charge, the ACC may order that the corporation make reparation of the overcharge. *Id.* at section 40–248(A). Finally, the Arizona legislature has provided for appeal of decisions of the ACC to superior court, *id.* at section 40–254(A), and finally to the Arizona Supreme Court, *id.* at section 40–254(D).

It is clear that the Arizona legislature has provided the ACC with the power to implement and supervise its regulatory mandate. NewVector argues that this is all that is required to satisfy the second prong of the *Midcal* test, and that the court should not consider whether the ACC actually implemented its supervisory powers, and should not review the substantive

---

11. The question of whether a particular product, market, or service, "deregulated" at the time of the alleged anticompetitive conduct, is subject to antitrust scrutiny is better considered under the active supervision prong of the *Midcal* test. Since the activities challenged in this lawsuit

have not been "deregulated" under section 40–281(E), the court need not consider whether the oversight accorded a section 40–281(E) product, market, or service satisfies the active supervision test.

decision of the regulatory agency. New-Vector's position might hold true in cases where the scope of the regulation, once a clearly articulated state policy to regulate is established, expressly includes the type of anticompetitive conduct challenged. For instance, in *New Motor Vehicle Board of California v. Orrin W. Fox Co.*, 439 U.S. 96, 101–03, 99 S.Ct. 403, 407–08, 58 L.Ed.2d 361 (1978), the statute at issue specifically required the California New Motor Vehicle Board to consider the desirability, based on specific criteria, of permitting a new automobile franchise in an area already served by a franchise selling the same line or make of automobile. In such a case it is fair to assume that the regulatory agency will abide by its statutory mandate.

NewVector relies on the case of *Turf Paradise, Inc. v. Arizona Downs*, 670 F.2d 813 (9th Cir.), *cert. denied*, 456 U.S. 1011, 102 S.Ct. 2308, 73 L.Ed.2d 1308 (1982), for the proposition that the adequacy of state supervision is to be judged only by whether the state has established a regulatory program to implement its policy to displace competition with regulation. It argues that in *Turf Paradise* a private agreement between two race track operators to divide racing dates was immune from antitrust liability even though the agreement itself was not explicitly subject to state regulation and approval. NewVector misconstrues *Turf Paradise*. The Ninth Circuit found: "[I]t was the stated policy of the Arizona Legislature that conflicts in dates be settled by the private parties and not by the Commission.... Moreover, notwithstanding this policy, it was and still is the duty of the Commission to assure that only qualified applicants were granted permits." *Id.* at 824. The court concluded that the Arizona Racing Commission "in effect does review the 'reasonableness' of the private date allocation agreement." *Id.* at 825. Thus, contrary to NewVector's reading of the case, the Ninth Circuit found that the regulatory scheme provided for regulation of date allocation. Again, as in *Orrin W. Fox*, it is fair to assume that the Commission carried out its mandated function.

█ In the case now before the court, there is no question that a regulatory scheme is in place, and that the scheme provides a mechanism for supervision. As discussed above, the Arizona Constitution and statutes clearly articulate a policy to have the ACC determine just and reasonable rates rather than to have the cost of wholesale cellular service determined by a free market. Metro Mobile's position, however, is that the admittedly existing regulations simply do not apply to the allegedly anticompetitive conduct of NewVector. Since the Arizona statutory scheme does not specifically mention price squeezes, unlike the statutory schemes in cases like *Orrin W. Fox*, the only way to determine whether the specific conduct, here a price squeeze, falls within the regulatory scheme is to analyze the actions of the regulatory agency in carrying out its statutory mandate. The Supreme Court has told us that *Parker* immunity applies when the state as sovereign vests discretion in the regulatory agency as to the interpretation of the regulatory scheme, *see Southern Motor Carriers*, 471 U.S. at 64, 105 S.Ct. at 1730. A court must therefore look beyond the language of the constitution or statute to determine whether conduct which is not expressly required or permitted by the constitution or statutes nonetheless retains *Parker* immunity because of the actions of the regulatory agency. As discussed above, the specific findings of the ACC convinces the court that it exercised its discretion to include the effect of wholesale costs on the retail cellular market as a part of a clearly articulated state policy to regulate the wholesale cellular market. Similarly, the court must look to the specific actions of the ACC in supervising the effect of the wholesale tariff on the retail market to determine whether the active supervision prong of the *Midcal* test is met.

The findings of the ACC, which were discussed above in the context of whether there was a clearly articulated policy to regulate the wholesale tariff insofar as it affects the retail market, also serve to establish that the ACC actively supervised the wholesale cost/retail price relationship. As discussed above, the ACC struck a volume discount provision from the tariff based on retail market considerations. The ACC further rejected the price squeeze ar-

gument that the independent retail sales of cellular service would be precluded by the wholesale rates. Most importantly for the active supervision analysis, the ACC expressly stated: "Should actual experience in this business prove to us that the precautions ordered in this instance were unnecessary or that additional restrictions and regulation are warranted, we have ample authority to modify our decision herein." NewVector Exs., Vol. II, Ex. 27, pg. 6. Indeed, at the time it approved NewVector's wholesale tariff on an interim basis, the ACC ordered NewVector to file a permanent rate application after six months of operation. *Id.* at Vol. II, Ex. 27, pg. 9. On August 21, 1986 the ACC approved New-Vector's existing tariff and discharged its contingent refund obligation for overcharges. *Id.* at Vol. II, Ex. 31, pg. 4. In its opinion, the ACC noted that "the primary concern of the Commission in [approving NewVector's interim tariff] was that NewVector would initially charge unjust and unreasonable rates on account of the lack of effective competition during the hiatus between the initial operations of NewVector and the operation of a second wholesale provider of cellular service." *Id.* at Vol. II, Ex. 31, pg. 2. Because the ACC had received no complaints concerning the rates charged by NewVector during the headstart period, and because it assumed that there would be no complaints now that Metro Mobile was providing wholesale service, the ACC approved NewVector's wholesale tariff. *Id.* The record reflects much more than "passive acceptance" of the tariff. *See Midcal*, 445 U.S. at 104, 100 S.Ct. at 942.

■ Metro Mobile argues that the court should examine the substance of the ACC's wholesale rate regulation to determine if it demonstrates the requisite active supervision. It argues that the ACC's "minimal, notice regulation of wholesale prices" does not satisfy the active supervision test. A federal court's role in assessing active supervision is limited to whether provisions for regulatory oversight exist, and, if necessary, whether the specific conduct alleged to be anticompetitive is included as a part of the regulatory oversight. It is not within the province of the federal court to examine the substantive decisions of the state regulatory agency. State action immunity is based on the concept of federalism. The purpose of the *Midcal* analysis is simply to determine whether the state has manifested a serious intent to structure intrastate commerce in accordance with the state's economic policies. So long as that intent is clearly articulated and supervised by the state as sovereign, the federal government has no further interest in the substance or the method of the state's policy. *See, eg., Southern Motor Carriers*, 471 U.S. at 61–62, 105 S.Ct. at 1729. Indeed, the Ninth Circuit has held that "actions otherwise immune should not forfeit that protection because the state's attempted exercise of its power is imperfect in execution under its own law." *Llewellyn v. Crothers*, 765 F.2d 769, 774 (9th Cir. 1985). The court found that the task of correcting errors of fact, law, or judgment should be left to state tribunals. *Id.* (quoting Areeda, *Antitrust Immunity for "State Action" After Lafayette*, 95 Harv. L.Rev. 435, 449–50 (1981)). The *Llewellyn* court also pointed out that if errors by the state agency could invalidate *Parker* immunity, there would be the temptation for "aggrieved parties to forego available state corrective processes in hopes of obtaining the treble damages remedy conferred by the Sherman Act."[12]

Metro Mobile argues that even assuming a clearly articulated state policy to displace competition with regulation in the cellular market and active supervision, "NewVector's pricing and other nonpricing practices would not be shielded from antitrust attack if those practices violated the intended policies of the Arizona legislature and the ACC." Metro Mobile's Response at 63.[13]

---

12. When asked by this court why it did not appeal the ACC's interim approval of NewVector's wholesale tariff to the superior court, counsel for Metro Mobile responded: "Because we believe the antitrust laws apply and that's our remedy, your Honor." Reporter's Transcript, February 9, 1987, at 47.

13. Metro Mobile relies on the case of *Kern-Tulare Water District v. City of Bakersfield*, 634 F.Supp. 656 (E.D.Cal.1986). The *Kern-Tulare* court found that "defendant's acts contravened state water policy and therefore could not have been contemplated by the legislature." *Id.* at

The answer is simple: if NewVector's practices violate the policies of the Arizona legislature and the ACC, the proper forums are the ACC and the courts of Arizona. *See Patrick v. Burget,* 800 F.2d 1498, 1507 (9th Cir.1986).

### B. The Non-Pricing Allegations

NewVector also contends that the five non-pricing aspects of Metro Mobile's Complaint are immunized under the *Parker* doctrine. It is clear that the Arizona regulatory scheme is primarily concerned with rate regulation. The Arizona Constitution, however, grants to the ACC power to "make reasonable rules, regulations, and orders, by which [public service] corporations shall be governed in the transactions of business within the state...." Ariz. Const. Art. XV, section 3. The Arizona statutes provide that "the [ACC] may supervise and regulate every public service corporation in the state and do all things, whether specifically designated in this title or in addition thereto, necessary and convenient in the exercise of such power and jurisdiction." A.R.S. section 40–202(A). If the "rules, regulations, *practices* or contracts [of a public service corporation] are unjust, discriminatory or preferential, illegal or insufficient, the [ACC] shall determine and prescribe them by order...." *Id.* at section 40–203 (emphasis added). The ACC or any person may file a written complaint "setting forth any act or thing done or omitted to be done by any public service corporation in violation, or claimed to be in violation, of any provision of law or any order or rule of the commission...." *Id.* at section 40–246. The ACC is empowered to hold hearings on and to prescribe, among other things, just and reasonable practices of public service corporations. *Id.* at section 40–250(C). The statutes also provide for extended regulatory oversight of services and facilities of public service corporations. *Id.* at sections 40–321 to –339.

▮ As with the pricing aspects of regulations under the Arizona code, the Arizona Constitution and statutes have granted the ACC great discretion in how it interprets its mandate. As discussed above, in determining whether there is a clearly articulated state policy and active supervision as to a specific "detail" of regulation, the court looks to the interpretation of the ACC as to whether its jurisdiction includes the challenged conduct. There is no evidence in the record before the court as to whether the ACC would accept jurisdiction over any of the non-pricing allegations in the Complaint. As such, there is a genuine question of fact as to that issue. Defendants motion for summary judgment as to state action immunity is denied as to the nonpricing conduct.

### III. MONOPOLIZATION

▮ Metro Mobile's Complaint alleges that NewVector monopolized the wholesale cellular market during the headstart period. The essence of Metro Mobile's monopolization claim is that NewVector had monopoly power during the headstart period by virtue of the fact that it was the only provider of wholesale cellular service during that seventeen month period. Metro Mobile claims that NewVector engaged in anticompetitive practices, including the price squeeze, in order to maintain wholesale monopoly power after the headstart period. Metro Mobile claims that NewVector intended that these allegedly anticompetitive practices, detailed above, would prevent Metro Mobile's successful entry or continued vitality as a wholesale competitor by denying Metro Mobile the retail customer base Metro Mobile claims it required to compete effectively with NewVector at wholesale. To prove monopolization under section 2 of the Sherman Act, 15 U.S.C. section 2, Metro Mobile must show that NewVector 1) possessed monopoly power in the relevant market [14] during the head-

663. As discussed above, the contemplation standard only applies to cases involving immunity of acts of municipalities. *Kern-Tulare* is therefore inapposite.

**14.** There is no dispute that the relevant geographic market is the Phoenix Metropolitan Sta-

tistical Area as defined by the FCC. Metro Mobile defines the product market as cellular telephone service, while NewVector argues that it should also include other forms of mobile two-way communication. NewVector has accepted Metro Mobile's definition of the product market for purposes of this motion.

**1522**

start period, 2) willfully acquired or maintained that power, and 3) that Metro Mobile has suffered an antitrust injury caused by NewVector's conduct. *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 924 (9th Cir.1980), *cert. denied*, 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981). NewVector's motion for summary judgment challenges existence of the first prong of the test, monopoly power.

 Monopoly power is the power to control prices and exclude competition. *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1004, 100 L.Ed. 1264 (1956).[15] It is undisputed that NewVector was the only wholesale provider of cellular service during the headstart period. Even though NewVector had a 100% share of the wholesale market during the headstart period, that fact alone is not enough to establish monopoly power. *Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1336 (7th Cir.1986) ("Market share is just a way of estimating market power, which is the ultimate consideration. When there are better ways to estimate market power, the court should use them."). *Southern Pacific Communications Co. v. American Tel. & Tel. Co.*, 740 F.2d 980, 1000 (D.C.Cir.1984), *cert. denied*, 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 380 (1985) ("A predominant market share may merely be the result of regulation...."). A court is to look beyond market share in determining monopoly power. *Pacific Coast Agric. Export Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1204 (9th Cir.1975), *cert. denied*, 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976). Indeed Metro Mobile quoted the

following factors from a publication of the American Bar Association:

> The relative size of competitors, competitors' performance, *the degree of barriers to entry or expansion*, pricing trends and practices, homogeneity of products, *potential competition*, and the *stability of market shares over time*, alone or in conjunction with other factors, may also be considered in measuring a firm's market power or market shares.

American Bar Association, *Antitrust Law Developments 2d*, at 120 (1984) (citations omitted) (emphasis added). The ultimate question is whether NewVector had the power to exclude competition or to raise prices. *American Tobacco Co. v. United States*, 328 U.S. 781, 811, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946).

 The record before the court is clear that NewVector had no power during the headstart period to exclude its only competition in the wholesale market, Metro Mobile. The evidence presented at an earlier preliminary injunction hearing in this case established without dispute that Metro Mobile had sufficient financial backing to construct its cellular system, and that it fully intended to enter the wholesale market.[16] Indeed, the FCC required such a showing before it would grant Metro Mobile the non-wireline license. Likewise, the ACC considers financial stability in issuing a certificate of public convenience and necessity.

NewVector began operating its cellular system on August 20, 1984. On October 5, 1984 Metro Mobile was awarded the non-wireline construction license. At that point there was no question that there would be competition in the wholesale market as

---

**15.** NewVector argues that Metro Mobile must prove *both* the ability to control prices and exclude competition. Metro Mobile contends that it need show only one or the other to prove monopoly power. Since the court finds that NewVector could do neither during the headstart period, the court need not address the dispute.

**16.** This evidence was presented under seal pursuant to court order. Metro Mobile argues that its expert witness testified during the preliminary injunction hearing that NewVector's anticompetitive activities "could result either in Metro Mobile not being able to enter the whole-

sale market or, if it did enter, doing so in a weakened state such that it would not be a strong competitive force in that market." Metro Mobile's Response at 14. A review of the record shows that the expert witness was testifying only as to his interpretation of the allegations of Metro Mobile's complaint, and not as to his opinion of what actually would occur. This in no way contradicts extensive unrefuted evidence that Metro Mobile had the ability and intention to enter the wholesale market no matter what NewVector did. There is no question of fact as to this issue that would prevent the entry of summary judgment.

soon as Metro Mobile got its system constructed and operating. Indeed, in March 1986 Metro Mobile's system became operational and it began to provide wholesale cellular service. The FCC made the decision to allow the headstart period because the immediate need for cellular service outweighed any possible harm to the non-wireline competitor. 86 F.C.C.2d at 491 n. 57. The FCC also concluded that each market for cellular service could support two systems. *Id.* ("[B]ecause of the great unsatisfied existing and potential demand for cellular service, it is unlikely that many markets will be unable to support two cellular systems.") Even assuming that the Phoenix market could support only one wholesale cellular provider, it is inconceivable that NewVector could satisfy the entire market in the year or so before Metro Mobile got its system operational.[17] At that point, quality of service and price competition would determine which competitor survived. It is also inconceivable that NewVector would develop a degree of brand loyalty in a year to a year and a half that would persuade a businessman (undisputedly the initial target market for cellular service) to forego better price or better service from a competitor.

In addition, the inevitable entry of Metro Mobile as a competitor in the wholesale market precluded NewVector from having the power to control prices. Once Metro Mobile entered the market there would necessarily be price competition, within the confines of regulation by the ACC, at wholesale. Although it may be possible to have "temporary monopoly power" in another context, the record is clear in this case that no such power existed.

In *Borough of Lansdale v. Philadelphia Elec. Co.*, 692 F.2d 307 (3d Cir.1982), a municipality which operated a small retail electric company brought suit against its vertically integrated wholesale supplier under section 2 of the Sherman Act. 692 F.2d at 308–09. The complaint for damages and injunctive relief alleged that defendant monopolized the wholesale market for electric power through use of a price squeeze. The court held that testimony that the plaintiff could have built transmission lines to another wholesale supplier in as little as 14 to 16 months was sufficient to support a jury finding of no monopoly power, even though defendant had a 100% market share in the relevant market. *Id.* at 313–14. The court found that defendant "lacked the physical power to exclude wholesale competitors from its service area" because plaintiff could build lines to other wholesalers. *Id.* The court also found that since the wholesale rates of the alternative suppliers were lower than defendant's rates, there was no economic power to exclude competition, and presumably, to control prices. *Id.* The evidence in the case before this court is clear that Metro Mobile was fully capable of constructing, and indeed was constructing, its own cellular system, thus providing an alternative wholesale supplier within a period of time similar to that in *Lansdale*.

Similarly, in the case of *Williamsburg Wax Museum, Inc. v. Historical Figures, Inc.*, 810 F.2d 243, 252 (D.C.Cir.1987), the court held that defendant did not have monopoly power in the wax museum figure market even though the only other possible supplier could not deliver the required figures for "about a year," while defendant could deliver immediately. The court rejected plaintiff's theory of time-limited monopoly power as well as "the proposition that a seller who can deliver a product sooner than a known competitor is a monopolist under the antitrust laws for the period in which he alone is able to deliver." *Id.* Here, Metro Mobile was a known competitor during the headstart period whose ability to deliver the product was limited primarily by its own efficiency in constructing its cellular system.

Metro Mobile's claim for damages is based on the theory that NewVector's anticompetitive conduct was intended to deny it a customer base at retail which in turn would hinder or prevent its entry into the wholesale market. As discussed above, the record is clear that any losses Metro Mobile might have suffered during the headstart

---

17. Undisputed testimony in the record indicates that the Phoenix market can support 180,000 cellular customers. In March 1986, at the end of the headstart period, only 3.8% of this total, 6849, were using cellular service. Reporter's Transcript, February 26, 1986, pp. 146–47.

period were not going to prevent it from constructing and placing into operation its own system. As to the allegation of hindering Metro Mobile's entry into the wholesale market, the lesson from *Lansdale* and *Williamsburg Wax Museum* is that the victim of temporary anticompetitive conduct must accept losses for the period of time before the alternate source is available. The Borough of Lansdale had to continue paying the rates charged by Philadelphia Electric, and presumably suffer losses, for the 14 to 16 months it would take to construct a transmission line to another supplier of power. The wax museums had to face loss of business for the year or so they had to wait for delivery of their new wax figures from the alternate supplier. These temporary losses did not change the fact that the availability of substitute suppliers prevented a finding of monopoly power. In this case, there was nothing to prevent Metro Mobile from continuing vigorously to build its customer base at retail. Indeed, the record shows that Metro Mobile did in fact continue to compete vigorously with NewVector for retail customers even while it complained of paying anticompetitive prices for the New-Vector wholesale service that it resold.[18] Any losses that it might have suffered were temporary, as in *Lansdale* and *Williamsburg Wax Museum*. The only inference that can be drawn is that Metro Mobile made the business judgment that it was better to continue to build its customer base at retail, even though it meant incurring greater temporary losses, than to cut the losses and withdraw from the retail market pending the completion of its own system. Metro Mobile's actions are inconsistent with its theory of recovery, and this case is indistinguishable from *Lansdale* and *Williamsburg Wax Museum*.

Metro Mobile argues that the existence of monopoly power is a question of fact that cannot be determined through a motion for summary judgment. As in any context, summary judgment can be granted as to the issue of monopoly power when there is no genuine issue of material fact. *Broadway Delivery Corp. v. United Par-*

*cel Serv. of America, Inc.,* 651 F.2d 122, 129 (2d Cir.), *cert. denied,* 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981); *Humboldt Bay Mun. Water Dist. v. Louisiana- Pacific Corp.,* 608 F.Supp. 562, 566 (N.D. Cal.1985), *aff'd mem.,* 787 F.2d 597 (9th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 276, 93 L.Ed.2d 52 (1986); *see also Glen Eden Hosp., Inc. v. Blue Cross and Blue Shield of Michigan, Inc.,* 740 F.2d 423, 430 (6th Cir.1984); *Kirk-Mayer, Inc. v. Pac Ord, Inc.,* 626 F.Supp. 1168, 1170–71 (C.D. Cal.1986). As discussed above, the undisputed facts, especially as to the total lack of barriers to entry in the wholesale market as to Metro Mobile during the headstart period, lead the court to conclude that as a matter of law NewVector had no monopoly power during the headstart period.

Metro Mobile argues in its Response that NewVector's actions also support a claim of attempt to monopolize the wholesale cellular market. The First Amended Complaint makes no claim of attempted monopolization. Even assuming that Metro Mobile had pleaded a claim for attempted monopolization during the headstart period, the court would grant summary judgment to NewVector based on the same analysis. To prove attempted monopolization, Metro Mobile would have to show a dangerous probability that NewVector could attain monopoly power. *William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.,* 668 F.2d 1014, 1027 (9th Cir. 1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 58, 74 L.Ed.2d 61 (1982). For the reasons discussed above, it is clear that it was essentially impossible for NewVector to attain monopoly power during the headstart period at issue in this case.

Metro Mobile's Complaint does not allege monopolization or attempted monopolization other than during the headstart period. The Complaint alleges that "NewVector has *continued* to possess [after the headstart period] market power over wholesale cellular service," Complaint at paragraph 15 (emphasis added), and that NewVector's allegedly unlawful acts were intended to

---

**18.** The record from the preliminary injunction hearing shows that Metro Mobile won a large

contract with Maricopa County by bidding a price less than that submitted by NewVector.

*"maintain* its headstart monopoly power," *id.* at paragraph 42 (emphasis added). The damages and injunctive relief sought are for unlawfully "maintaining" monopoly power in the wholesale market. *Id.* at Relief Requested A and C. Since the court has held that NewVector had no monopoly power during the headstart period, it is impossible for NewVector to "maintain" monopoly power after the headstart period. This lawsuit does not involve NewVector's market power or its practices after Metro Mobile entered the wholesale market in March 1986.

Metro Mobile is not without a remedy for improper conduct on the part of NewVector during the headstart period. The FCC or the ACC may accept jurisdiction over its six claims of wrongdoing, and there are Arizona statutory and common law remedies available. For the reasons discussed above, the federal antitrust laws simply do not extend to NewVector's behavior during the seventeen month headstart period.

## IV. CONCLUSION

The State of Arizona, through its constitution and statutes, as interpreted by its corporation commission, has a clearly articulated state policy to replace competition with regulation in the wholesale cellular market. The actions of the ACC make clear that this policy extends to the wholesale cost/retail price squeeze alleged by Metro Mobile. It is also clear that the state as sovereign has provided, and the ACC has implemented, a supervisory mechanism as to that same issue. There is no question of fact as to the applicability of state action immunity to the price squeeze allegation in Metro Mobile's Complaint.[19] The issue is one of interpretation of the constitution and statutes of the State of Arizona, and the rulings of the ACC. Summary judgment is granted as to that claim.

There exist genuine questions of material fact as to whether the ACC would extend its jurisdiction over the non-pricing allegations in the Complaint, and NewVector's request for summary judgment as to the non-pricing claims is denied on that grounds.

As an alternate and independent grounds, summary judgment is granted as to all of Metro Mobile's claims because NewVector did not have monopoly power during the headstart period. The inevitable entry of Metro Mobile as a provider of wholesale cellular service precluded NewVector from excluding competition or controlling prices. The court will not recognize a temporary monopoly under these facts, especially because control over the length of the headstart period rested primarily with Metro Mobile. The court's conclusion is based on undisputed facts in the record. There is no dispute as to a material fact that would prevent entry of summary judgment as to monopoly power. To the extent that Metro Mobile's Complaint alleges a claim for attempt to monopolize, it is also dismissed on the grounds that there is no dangerous probability that NewVector could monopolize the wholesale market during the headstart period.

This ruling dismisses all claims in Metro Mobile's First Amended Complaint. NewVector's Counterclaim involves claims unrelated to these antitrust claims. There is no just reason to delay entry of judgment as to Metro Mobile's First Amended Complaint. The clerk of the court is directed to enter judgment in favor of NewVector on Metro Mobile's First Amended Complaint.

## ORDER

Based on the voluminous memoranda of points and authorities filed in support of and opposition to NewVector's Motion for

---

**19.** Metro Mobile argues that there is a genuine question of material fact as to whether NewVector acted in a manner consistent with the belief that the Arizona constitutional and legislative scheme met the requirements of state action immunity. Metro Mobile raised this issue earlier in a motion to continue its time to respond to the summary judgment motion in order to conduct discovery under F.R.Civ.P. 56(f). At that time the court ruled that NewVector's belief and

actions regarding the applicability of the state action immunity doctrine are irrelevant to the determination of whether the immunity applied; the court has not changed its opinion. *See Llewellyn,* 765 F.2d at 774 ("The availability of *Parker* immunity, however, does not depend on the subjective motivations of the individual actors, but rather on the satisfaction of the objective standards set forth in *Parker* and authorities which interpret it.")

**1526**

Summary Judgment on Metro Mobile's Claims, oral argument before the court, and the entire record in this case, it is hereby ordered,

That NewVector's Motion for Summary Judgment is GRANTED as to Metro Mobile's price squeeze claim on state action immunity grounds;

That NewVector's Motion for Summary Judgment is DENIED as to the five non-pricing claims on the grounds that there exists a question of material fact as to whether state action immunity exempts these practices from antitrust scrutiny;

That NewVector's Motion for Summary Judgment is GRANTED as to all claims in Metro Mobile's First Amended Complaint on the grounds that NewVector did not have, and could not obtain, monopoly power during the headstart period at issue in this lawsuit;

That there is no just reason to delay entry of judgment in favor of NewVector on all of the claims in Metro Mobile's First Amended Complaint;

That the clerk of the court shall enter judgment accordingly.