**McCAW PERSONAL COMMUNICATIONS, INC., Plaintiff,**

v.

**PACIFIC TELESIS GROUP, Defendant,**

**and**

**Communications Industries, Inc., Intervenor.**

No. C–86–0374 SW.

United States District Court, N.D. California.

Sept. 18, 1986.

Milbank, Tweed, Hadley & McCloy, John H. Shenefield, Peter E. Halle, D. Stephen Mathias, Washington, D.C., McCutchen, Doyle, Brown & Enersen, David M. Balabanian, Terry J. Houlihan, San Francisco, Cal., for plaintiff.

Pillsbury, Madison & Sutro, Richard W. Odgers, Mary B. Cranston, Paul R. Griffin, Nancy J. Murray, San Francisco, Cal., for defendant, Pacific Telesis Group.

David M. Wilson, Barry W. Lee, Carl Diehl, Dinkelspiel, Donovan & Reder, San Francisco, Cal., for defendant Communications Industries, Inc.

## MEMORANDUM DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

SPENCER WILLIAMS, District Judge.

Defendant Pacific Telesis Group ("Pacific") has agreed to acquire the assets of Communications Industries, Inc. ("CI"), including CI's paging businesses in San Francisco, San Diego and Fresno. Plaintiff McCaw Personal Communications, Inc. ("McCaw"), has entered into its own agreement to purchase paging businesses in these three cities, from MCI Airsignal Inc. ("MCI"). Contending that Pacific's acquisition of CI's paging assets would substantially lessen competition in the paging markets in San Francisco, San Diego and Fresno, McCaw filed the instant action, claiming, *inter alia*, that the acquisition would violate Section 7 of the Clayton Act, 15 U.S.C. § 18 (1982). McCaw moved to en-

join the acquisition, and CI was permitted to intervene under Fed.R.Civ.P. 24(a). Following a hearing and extensive briefing on McCaw's motion, the court declined to halt the closing of the Pacific/CI acquisition, but did issue a limited preliminary injunction prohibiting Pacific from taking control of CI's paging assets pending further proceedings. Order Granting Limited Preliminary Injunction on "Paging" Issues, February 27, 1986.[1] Pacific then brought the instant motion for summary judgment, on the ground that there exists no triable issue of fact as to whether its acquisition of CI would substantially lessen competition within the meaning of the Clayton Act. By order filed August 7, 1986, the court denied Pacific's motion. This memorandum elaborates on the court's reasoning.

## FACTUAL BACKGROUND

CI, through a subsidiary, is the largest operator in the paging[2] markets in San Francisco and San Diego, and is second largest (behind MCI) in Fresno.[3] In terms of the number of paging units (beepers) presently in use, CI has a 66.7% share of the San Francisco paging market, a 70% share in the San Diego market and a 34.1% market share in Fresno. Pacific's paging operations in these three markets possess shares of 5.1%, 12.9% and 2.3%, respectively. In terms of the Herfindahl-Hirschman Index (HHI) measure of market concentration, the post-acquisition measure of concentration for the Pacific/CI combination would be 5155 in San Francisco, 6872 in San Diego, and 1325 in Fresno.

McCaw has contracted with MCI to purchase the latter's paging businesses in numerous markets, including the three geo-

---

**1.** At the same time, the court denied a separate preliminary injunction motion brought by McCaw Communications of San Francisco, Inc. and McCaw Communications of San Jose, Inc., entities related to the plaintiff herein, based upon the impact of Pacific's acquisition of CI on the cellular telephone business in San Francisco and San Jose. *McCaw Communications of San Francisco, Inc. v. The Pacific Telesis Group,* —— F.Supp. ——, C 85–4004 SW, Order Denying Plaintiffs' Motion for a Preliminary Injunction, February 27, 1986.

**2.** Paging is a one-way communications service in which customers are provided with small, portable radio units that typically emit a "beep" when signaled, alerting the user to call and receive a telephone message.

**3.** There is no dispute between the parties that the appropriate product market is paging services, and that three distinct geographic markets, San Francisco, San Diego and Fresno are at issue in the case.

graphic markets at issue here.[4] MCI's paging assets include equipment installed and ready to operate in San Francisco and San Diego, and an operating system in Fresno. McCaw's acquisition of MCI's paging businesses has not been completed, because the purchase is subject to the approval of the California Public Utilities Commission (PUC), and that agency has scheduled hearings to address the propriety of the acquisition. This acquisition was approved by the Federal Communications Commission (FCC) on July 1, 1986.

Pacific's acquisition of CI has been approved by the FCC and the PUC, and the Department of Justice has decided not to oppose the paging aspects of the merger. The merger closed on February 28, 1986, permitting the transfer of CI's assets to a trustee. Upon final FCC approval on May 27, 1986, CI's assets were transferred from the trustee to Pacific, except for the paging assets subject to this court's limited preliminary injunction.

DISCUSSION

Pacific moves for summary judgment on a number of grounds.

1. Standing and antitrust injury

■ Pacific first contends that McCaw lacks standing to sue under the Clayton Act, because McCaw is not presently a competitor in the three relevant geographic markets, and the acquisition of MCI's paging businesses is contingent upon regulatory approval. McCaw, by this lawsuit, seeks primarily injunctive relief under Section 16 of the Clayton Act, 18 U.S.C. § 26. The standing requirements under Section 16 are broader than those under Section 4 of the Act, which provides for monetary damages. *Parks v. Watson*, 716 F.2d 646, 662 (9th Cir.1983). To have standing to obtain an injunction, a plaintiff must demonstrate (1) "a threatened loss or injury

cognizable in equity (2) proximately resulting from the alleged antitrust violation." *City of Rohnert Park v. Harris*, 601 F.2d 1040, 1044 (9th Cir.1979), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980). McCaw claims standing as a prospective purchaser of a present competitor of Pacific, under the authority of *Solinger v. A & M Records, Inc.*, 586 F.2d 1304 (9th Cir.1978), *cert. denied*, 441 U.S. 908, 99 S.Ct. 1999, 60 L.Ed.2d 377 (1979).[5] In *Solinger*, the court held that a prospective purchaser of a business would have standing to sue if it possessed "the intention and preparedness" to proceed with the purchase. *Id.* at 1310. The court outlined four factors to consider:

1. The background and experience of plaintiff in his prospective business ...

2. Affirmative action on the part of plaintiff to engage in the proposed business ...

3. The ability of plaintiff to finance the business and the purchase of equipment and facilities necessary to engage in the business ...

4. The consummation of contracts by plaintiff. ...

*Id.* (quoting *Waldron v. British Petroleum Co.*, 231 F.Supp. 72, 81–82 (S.D.N.Y.1964)). Although the precise holding of *Solinger* has been undermined by subsequent authority, *see Solinger v. A & M Records*, 718 F.2d 298, 299 (9th Cir.1983) (denying standing where plaintiff was merely a shareholder of the corporation seeking to purchase the party injured by the alleged antitrust violation), the general rule it states regarding the test for standing as a prospective purchaser remains viable. *See, e.g., Parks*, 716 F.2d at 660 (applying the four factors enumerated above).

■ Pacific does not dispute that McCaw has significant background and experience in the paging business, and that it has the

---

4. McCaw Communications Companies, Inc., an affiliate of plaintiff herein, does possess FCC paging licenses in these markets. However, plaintiff does not principally rely upon these licenses to support its claim of antitrust standing.

5. Although *Solinger* was a Section 4 case, and thus arguably more restrictive than necessary for Section 16 purposes, it is nevertheless instructive on the standards to be applied when a prospective purchaser asserts standing to seek injunctive relief.

capacity to finance and operate the paging operations it seeks from MCI. McCaw has, in addition, entered into a binding, written contract with MCI. Moreover, the acquisition has apparently "closed" to the extent that McCaw has paid MCI for its stock in MCI Airsignal. On these undisputed facts, McCaw has conclusively demonstrated its intention and preparedness to enter the paging business. The sole contingency remaining is PUC approval of the acquisition, a barrier which is insufficient to deprive McCaw of standing. McCaw's "threatened loss or injury" is quite real. Indeed, given that the Clayton Act was "designed to arrest in its incipiency ... the substantial lessening of competition," *United States v. E.I. duPont de Nemours & Co.* 353 U.S. 586, 589, 77 S.Ct. 872, 875, 1 L.Ed.2d 1057 (1957), and that McCaw has demonstrated its status as a probable future owner of paging operations in competition with Pacific, it is perhaps better situated than MCI to assert the competitive interests of the paging operations it is seeking to acquire.

■ Pacific also contends that McCaw is unable to show that it will suffer "antitrust injury" as a result of Pacific's acquisition of CI. Antitrust plaintiffs must show that the relief they seek is for *"antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (emphasis in original). In the merger context,[6] the antitrust injury requirement is met if the plaintiff's claimed injury will result "either from a lessening of competition due to the acquisitions or from 'anticompetitive acts made possible' by the acquisitions." *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.,* 729 F.2d 1050,

1058–59 (6th Cir.), *cert. denied,* 469 U.S. 1036, 105 S.Ct. 511, 83 L.Ed.2d 401 (1984).

■ McCaw asserts that it is threatened with antitrust injury in several ways. First, it contends the Pacific/CI merger will give the combined firm sufficient market power on low cost paging frequencies to permit it to extract supra-competitive prices from these frequencies. This power, in turn, would allow Pacific to engage in predatory price-cutting against McCaw in selected markets, financed by the supra-competitive prices in other markets. Predatory prices would injure McCaw by either driving it out of business or by "disciplining" it. Pacific contends that such predatory pricing would be "irrational," because later supra-competitive pricing is impossible to maintain in a market with low barriers to entry. *See Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* —— U.S. ——, 106 S.Ct. 1348, 1359 n. 15, 89 L.Ed.2d 538 (1986). However, Pacific's argument assumes the existence of low entry barriers in paging, a question which is a matter of some dispute in this case. *See, infra,* Part 3. Moreover, the Court in *Matsushita* did not find predatory pricing to be irrational per se, but rather found that the number of firms in the electronics market combined with the length of time the alleged pricing scheme would have had to have continued in order to be successful, rendered such pricing conduct "self-deterring," and implausible as a matter of law. *Id.* 106 S.Ct. at 1360. Here, Pacific, a single firm allegedly in a position to implement a predatory pricing scheme, has not shown that McCaw's allegations in this regard are so improbable as to be inconsistent with economic reality. McCaw thus has shown, for the purposes of obtaining injunctive relief, that it may be injured by "anticompetitive acts made possible" by the Pacific/CI combination.[7]

---

6. Plaintiff initially contends that the antitrust injury requirement is applicable only to claims for damages. However, the court sees no basis for limiting the *Brunswick* principle in such a manner.

7. McCaw asserts that Pacific's ability to price at predatory levels would be enhanced by the possibility of cross-subsidization of its paging operations from its cellular business. This possibility, although not yet proven, lends further support to McCaw's claim of threatened antitrust injury.

2. Collateral estoppel and antitrust immunity

■ On February 28, 1986, the PUC, over the objections of McCaw, approved the acquisition by Pacific of the three paging properties at issue in this case. Opinion and Order, No. 86-02-059. That order was not appealed,[8] and it became final on May 16, 1986. Pacific contends that the PUC decision collaterally estops McCaw from relitigating in this forum the issues decided by the PUC.

Although the PUC is an administrative body, when such an agency "is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate," its decisions may be accorded collateral estoppel effect. *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966). Federal courts will ordinarily "give preclusive effect to a state administrative decision when a state court would itself give that administrative decision preclusive effect." *Plaine v. McCabe*, 790 F.2d 742, 748 n. 13 (9th Cir.1986). There is no dispute that McCaw had a full opportunity to be heard before the PUC. That body heard 19 days of testimony concerning the Pacific/CI acquisition. Moreover, it cannot seriously be questioned that the PUC functions in a "judicial" capacity. *People v. Western Air Lines, Inc.*, 42 Cal.2d 621, 630, 268 P.2d 723, *appeal dismissed*, 348 U.S. 859, 75 S.Ct. 87, 99 L.Ed. 677 (1954). McCaw contends, nevertheless, that California courts do not give PUC decisions preclusive effect if those decisions have not been reviewed by a state court. Dealing with an unappealed decision of the California Corporations Commissioner, the *Plaine* court stated that "a losing party cannot obstruct the preclusive use of [a] state administrative decision simply by foregoing [the] right to appeal." *Id.* 268 P.2d at 748 n. 12. It appears, however, that a different rule obtains for decisions of the PUC. *See Western Air Lines*, 42 Cal.2d at 630, 268 P.2d 723 (implying that PUC decisions are given collateral estoppel effect only where the decision has been reviewed in court), *Pacific Tel. and Tel. Co. v. Public Utilities Commission*, 600 F.2d 1309, 1312-14 (9th Cir.) (same), *cert. denied*, 444 U.S. 920, 100 S.Ct. 239, 62 L.Ed.2d 136 (1979). *See also Napa Valley Electric Co. v. Railroad Commission*, 251 U.S. 366, 40 S.Ct. 174, 64 L.Ed. 310 (1920).

Although Pacific argues vigorously in favor of the preclusive effect of unappealed PUC decisions, this court need not resolve this apparently uncertain question of state law. Even assuming that unappealed decisions of the PUC *are* entitled to preclusive effect, the doctrine of collateral estoppel does not apply unless "the issue necessarily decided at the previous [proceeding] is identical to the one which is sought to be relitigated." *People v. Sims*, 32 Cal.3d 468, 484, 186 Cal.Rptr. 77, 651 P.2d 321 (1982) (citation omitted). *Accord, Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1357 (9th Cir.1985) ("similarity between issues does not suffice; collateral estoppel is applied only when the issues are identical").

In the instant case, despite the fact that McCaw urged the PUC to apply Clayton Act principles, there is no indication in the record that the PUC deviated from its statutorily-mandated "public interest" standard for approval of transactions such as the instant one. Although the PUC undoubtedly does "take antitrust considerations into account in determining whether a [transaction] will advance the public interest," *Northern California Power Agency v. Public Utilities Commission*, 5 Cal.3d 370, 377, 96 Cal.Rptr. 18, 486 P.2d 1218 (1971), the agency is not strictly bound to apply antitrust principles as they have been enunciated by state or federal courts. Rather, " 'the antitrust laws are merely another tool which a regulatory agency employs to a greater or lesser degree to

8. PUC decisions may be appealed to the California Supreme Court pursuant to Cal.Pub.Util. Code § 1756.

give understandable content to the broad statutory concept of the public interest.'" *Id.* (quoting *Northern Natural Gas Co. v. Federal Power Commission*, 399 F.2d 953 (D.C.Cir.1968)). Thus, while the PUC here found that "PacTel's acquisition of CI's paging ... operations does not pose a significant threat of anticompetitive activities," and that "[t]he present state of the paging industry indicates that the proposed acquisition will have no significant adverse effect upon competition in the paging industry," Opinion at 27, it is far from clear that the PUC considered, much less applied, Clayton Act standards in reaching these determinations.[9] Unless those standards were applied in the manner mandated by federal antitrust law, the issue decided by the PUC is not the equivalent of the one before this court. "Issues are not identical if the second action involves application of a different legal standard, even though the factual setting of both suits [is] the same." *Peterson v. Clark Leasing Corp.*, 451 F.2d 1291, 1292 (9th Cir.1971) (per curiam). *See also* Wright, Miller and Cooper, *Federal Practice and Procedure*, § 4417, at 165–68 (1981). Therefore, McCaw is not collaterally estopped from pursuing its federal antitrust claims by virtue of the regulatory approval of the PUC.

Pacific also contends that the PUC's decision bars McCaw's claims under the doctrine of state action immunity. *California Retail Liquor Dealers Ass'n. v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) established a two-pronged test for determining whether state regulation shields private parties from federal antitrust law. The challenged restraint must be (1) "clearly articulated and affirmatively expressed" as state policy, and (2) the policy must be "actively supervised" by the state. *Id.* at 105, 100 S.Ct. at 943. A state policy, such as the instant one, which merely permits but does not compel anticompetitive activity, may satisfy the first prong of the *Midcal* test. *Southern Motor Carriers Rate Confer-*

ence, Inc. v. United States, 471 U.S. 48, 105 S.Ct. 1721, 1728, 85 L.Ed.2d 36 (1985). Moreover, a regulated party "need not 'point to a specific, detailed legislative authorization' for its challenged conduct." *Id.*, 105 S.Ct. at 1731 (quoting *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 415, 98 S.Ct. 1123, 1138, 55 L.Ed.2d 364 (1978) (Opinion of Brennan, J.)). Nevertheless, to give rise to state action immunity, it must be shown that "the State as sovereign clearly intends to displace competition in a particular field with a regulatory structure." 105 S.Ct. at 1731.

In the instant case, Pacific has made no showing that the State of California, through the PUC's review of acquisitions in the telecommunications field, intends to displace competition. Rather, given the antitrust component of the public interest standard applied by the PUC, it appears that California's intention was to *foster* competition, rather than to displace it. The state has not determined as a matter of policy that the conduct challenged by McCaw—the acquisition of a competitor—is to be insulated from competition or competitive concerns. To the extent the State as sovereign has expressed an opinion at all, it is merely to ensure that such acquisitions are in the public interest. Thus, the clear intention to authorize anticompetitive activity that existed in *Southern Motor Carriers* simply is not present here. Pacific's claim of state action immunity thus does not meet the first requirement of the *Midcal* test, and is therefore rejected as a ground for summary judgment.

### 3. Market concentration and barriers to entry

Plaintiff seeks to enjoin Pacific's acquisition of CI under Section 7 of the Clayton Act, which proscribes acquisitions "if there is a reasonable probability that the merger will substantially lessen competition" in a relevant market. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502,

---

**9.** Indeed, the agency's conclusion of law on this subject states merely that "[t]he proposed acqui-

sition is in the public interest and should be approved."

1524, 8 L.Ed.2d 510 (1962). Plaintiff also seeks relief under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. Because the standard by which an acquisition is judged under the Sherman Act is similar, if not identical, to that under the Clayton Act, this memorandum expressly addresses only the Clayton Act standard. *See United States v. First National Bank*, 376 U.S. 665, 669–71, 84 S.Ct. 1033, 1035–37, 12 L.Ed.2d 1 (1964) and *cf. United States v. Philadelphia National Bank*, 374 U.S. 321, 363, 83 S.Ct. 1715, 1741, 10 L.Ed.2d 915 (1963).

The combined present market shares of CI and Pacific in San Francisco, San Diego and Fresno, noted above, would render the acquisition presumptively illegal under the authority of *Philadelphia National Bank*, 374 U.S. at 363–64, 83 S.Ct. at 1741–42. This presumption places the burden on the defendant to show that the acquisition will not be anticompetitive. *See United States v. General Dynamics Corp.*, 415 U.S. 486, 501, 94 S.Ct. 1186, 1195–96, 39 L.Ed.2d 530 (1974) (concentration in coal industry at time of suit not likely to lead to market power in the future, due to distribution of coal reserves and changing industry conditions). As the *General Dynamics* case illustrates, market share measures are not an end in themselves. They are simply a means of "estimating market power, which is the ultimate consideration." *Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc.*, 784 F.2d 1325, 1336 (7th Cir.1986).

Because the Clayton Act was designed to protect against the possession of market power in the *future, E.I. duPont de Nemours*, 353 U.S. at 589, 77 S.Ct. at 875, it is essential to examine paging's "structure, history and probable future" in order to determine the probable effect of Pacific's acquisition of CI. *Brown Shoe*, 370 U.S. at 322 n. 38, 82 S.Ct. at 1522 n. 38. It is undisputed that the paging industry has been changing dramatically over the past five years. Numerous additional frequencies have been allocated by the FCC for private paging service, increasing the number of available frequencies from eight in 1981 to over 100 currently. Substantial growth in demand for paging services, fueled in part by decreasing prices, has also been occurring. Although the parties dispute the precise figures, the anticipated annual growth rate for paging is at least 12% in the geographic markets at issue here. Many new firms have obtained or are seeking regulatory approval for entry into these and other markets. The number of firms authorized to provide paging service in these three markets has doubled since 1982. This new entry, and the scope of possible future entry into the paging business, strongly suggests that present market concentration statistics reflect the prior scarcity of frequencies, and do not provide an accurate prediction of the future market power of the Pacific/CI combination.

Based on this evidence of market growth and low barriers to entry, Pacific contends that potential future competition should be taken into account in determining market share, by counting the number of frequencies assigned to licensees by the FCC (a "capacity" measure), rather than by the number of beepers presently in operation (an "output" measure). The practical effect of Pacific's approach is to shift the point at which the impact of new competition is considered, from the rebuttal of the prima facie case stage, to the market definition stage of analysis. However, this expansive approach to market share could be misleading. Pacific's "assigned frequencies" measure includes "competitors" who have been licensed by the FCC, but who have not yet built the necessary facilities or otherwise demonstrated an intention to actually use their assigned frequencies. To count such potential competitors as equivalent to those already with operating facilities would be to assume the virtual non-existence of barriers to entry, an issue which is sharply contested by the parties. Moreover, the parties dispute the comparability of costs of construction and operation on certain paging frequencies. *See infra.* As Professors Areeda and Turner have noted, "[o]utput figures are … less ambigu-

ous than capacity figures. 'Capacity' cannot be defined without reference to costs, and high-cost capacity should not be treated as the equivalent of low-cost capacity." II Areeda & Turner, *Antitrust Law*, at 350 (1978). Thus, the existence of low barriers to entry will be considered, at least for the purposes of this motion, as tending to rebut the presumption of illegality raised by the measures of current output-based market share.

The existence of low barriers to entry may rebut a prima facie showing of illegality, even where the combined market shares of the merged firms is quite high. *See United States v. Waste Management, Inc.*, 743 F.2d 976, 982–83 (2d Cir.1984) (48.8% market share), *United States v. Calmar Inc.*, 612 F.Supp. 1298, 1305–06 (D.C. N.J.1985) (50%). *And see Ball Memorial Hospital*, 784 F.2d at 1335. The key question here is the height of entry barriers in the paging business. While not contesting the above description of the dynamics of the paging industry, including frequency availability, McCaw contends that the frequencies available for entry in San Francisco, San Diego and Fresno are not equal in cost or quality to the frequencies possessed by Pacific and CI. Specifically, Pacific and CI are alleged to control the frequencies in the middle of the available spectrum—VHF and UHF—which, according to McCaw, are superior to the radio bands at either end of the spectrum (lowband and 900 Mhz), the bands on which Pacific contends new entry will occur. According to McCaw, VHF and UHF signals travel farther than 900 Mhz signals, and are more stable and penetrate buildings better than lowband signals. These differences in quality, according to McCaw's engineering expert, F. Scott Davis, translate into significantly higher costs for lowband and 900 Mhz facilities. McCaw thus contends that the generally low costs of entry and ease of obtaining FCC approval will not negate the market power that would otherwise be presumed to exist as a result of the Pacific/CI combination.

Although Pacific identifies a number of flaws in the declarations of Davis and McCaw's expert economist, Janusz A. Ordover, Pacific has not shown their conclusions to be so unfounded or incredible that they must be disregarded. The question of the credibility of these declarants is not a matter which can be decided on a motion for summary judgment. Moreover, while the views of the regulatory agencies which have approved this acquisition, finding low barriers to entry in the paging field, are entitled to deference, these agency opinions do not, as a matter of law, compel the conclusion that entry barriers are low. Rather, their views will be weighed along with the other evidence which will be produced at trial. The court therefore concludes that McCaw has raised a triable issue of fact as to the existence and height of the entry barriers that will allegedly inhibit new entry.

In accordance with the above reasoning, defendant's motion for summary judgment is hereby DENIED.