**ASPEN TITLE & ESCROW, INC., an Oregon corporation, Plaintiff,**

v.

**JELD–WEN, INC., an Oregon corporation; Trendwest Properties, Inc., an Oregon corporation; Trendwest Development Co., an Oregon corporation; Trendwest Capital Corp., an Oregon corporation; South Valley State Bank, a banking institution chartered under the laws of Oregon; Certified Mortgage Company, an Oregon corporation; MTC, Inc., dba Mountain Title Co., an Oregon corporation; and Richard L. Wendt, Roderick C. Wendt, Alan Craigmiles, and Robert A. Kent, individuals, Defendants.**

Civ. No. 86–615–RE.

United States District Court, D. Oregon.

Sept. 21, 1987.

Justine Fischer, Suzanne Bonamici, Stoll & Stoll, P.C., Portland, Or., for plaintiff.

Peter R. Jarvis, Stoel, Rives, Boley, Jones & Grey, Portland, Or., Blair M. Henderson, Henderson, Molatore & Klein, Klamath Falls, Or., for defendants.

## OPINION

REDDEN, District Judge:

All defendants in this action move for summary judgment of all counts of the complaint. I grant the motion for summary judgment on Counts I through IV, and dismiss Count V for lack of jurisdiction.

## LEGAL STANDARD

A motion for summary judgment shall be granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). A material fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. *T.W. Elec. Service v. Pacific Elec. Contractors*, 809 F.2d 626, 630 (9th Cir.1987). Materiality is thus determined by reference to the substantive law governing the claim or defense. *Id.*

Movants have the initial burden to demonstrate the absence of any material fact and entitlement to judgment as a matter of law. *Blair Foods, Inc. v. Ranchers Cotton Oil*, 610 F.2d 665, 668 (9th Cir.1980). They may meet their initial burden by identifying for the court the portions of the materials on file which demonstrate the absence of any genuine issue of material fact. *T.W. Elec.*, 809 F.2d at 630. The non-movant must then set forth specific facts showing that there is a genuine issue. *Id.*

Where conflicting evidence is presented, the truth of the non-movant's evidence must be assumed. *Id.* at 631. All inferences must be drawn in the light most favorable to the non-movant. *Id.* Summary judgment is disfavored in complex antitrust actions involving issues of motive and intent. *Poller v. Columbia Broadcasting*

*Sys.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962).

## BACKGROUND

Three companies in Klamath County, Oregon are licensed to provide title insurance services: plaintiff Aspen Title & Escrow (Aspen), defendant MTC, Inc., doing business as Mountain Title Co. (Mountain), and non-party Klamath County Title Company (Klamath). Klamath County is a relatively discrete and isolated geographical market. Aspen asserts that it is the relevant geographical market for this action, and I agree.

Title insurance indemnifies persons having an insurable interest in real property against loss or damage from defects or failure of title to a particular parcel of realty, or from enforcement of liens existing and not revealed at the time of the issuance of the policy. It is also used in two-party loan transactions, where a loan is secured by real estate already owned by the borrower. In such transactions, the lender takes the security interest in the real property, and is the sole insured. The custom in Klamath County, however, is that the borrower pays for the insurance.

Title insurance is sometimes used in purchase transactions. Typically two title insurance policies are issued: one in favor of the purchaser and one in favor of the lender.

The barriers to entry in the title insurance market in Klamath County are high. This is due to O.R.S. 731.438, which requires a title plant with records covering at least the 20 preceding years in order to be licensed as a title insurance company. A title plant, which includes old maps, plats, records, and indexes, is costly.

Demand for title insurance is derived. It depends on a transaction in which real estate is bought, sold, transferred, or used as security. Historically, price competition in the market has not been great. Formerly, prices were set by a rating bureau and were identical for all companies. Presently, prices are set by underwriters. The rates charged by Aspen, Mountain and Klamath are all set by their respective underwriters on a statewide basis.

The title insurance market is characterized by "reverse competition." That is, most competitive efforts are not aimed at persons who purchase title insurance, but rather at persons likely to refer the business of purchasers. This is because most purchasers do little repeat business, involving themselves only sporadically in the title insurance market. Referrers such as real estate brokers, bankers and attorneys, however, tend to do repeat business and thus are important targets for competitive efforts.

The escrow service market differs from the title insurance market. Barriers to entry are low. Many parties other than title insurance companies provide these services, notably banks and attorneys. Furthermore, many financial institutions close their transactions in-house, even though a title insurance company may be involved in issuing title insurance. Nonetheless, it is not uncommon for the title insurance issuer to close the transaction. Aspen estimates that 40% of title insurance transactions generate an escrow closing fee for the title insurance company.

Mountain's financial health is unquestioned. Klamath's financial health is also strong. Klamath's president, Bob Veatch, reports that its financial position has improved from year to year. The total gross premiums for title insurance have grown in recent years, from $506,000 in 1983, to $565,000 in 1984, to $573,000 in 1985 and to $709,000 in 1986.

Aspen contends that its own health is uncertain. Aspen is owned and operated by Andy Patterson and Marlene Addington. Aspen came into existence in March 1984, when it took over the Klamath Falls operations of Transamerica Title, which was managed by Patterson and Addington. Patterson and Addington purchased Aspen for $110,000 on a 100 percent leveraged basis. If Aspen's profit and loss statements are adjusted to add back the bonuses received by Patterson and Addington, and the legal expenses associated with this action, they show an adjusted income of $27,192 in the year ending February 1985, minus $8,153 the next year, and $64,743 for

the following year. Defendants also point out that Patterson admits that he needs 5.5 employees and 59 to 65 orders per month to remain in operation, and that Aspen has regularly maintained those levels. Aspen acknowledges these facts, but asserts that it is the bringing of this suit which has deterred defendants from taking action to damage Aspen's financial health more seriously.

Market share in the title insurance market can be calculated in two ways: by the number of recordings method or by the gross premiums method. Using either method, Aspen's market share has dropped since 1984. Using the gross premiums method, Aspen's 42% of the Klamath Falls title insurance market in the second quarter of 1984, compared to Mountain's and Klamath's 38% and 20% respectively. By the first quarter of 1986, the respective shares were 33%, 45% and 21%, and by the fourth quarter of 1986 they were 30%, 48% and 22%.

Aspen's market share has dropped since 1984, even as to transactions in which defendants were not involved. Using the number of recordings method, 94% of the title insurance transactions in Klamath County do not involve any of the defendants as a buyer, seller, borrower or lender. Of these transactions, Aspen had a 50% share of the market during the second half of 1984, which dropped to 38% in 1985, and to 32% in 1986. Similarly, if one isolates the transactions involving Klamath First Federal Savings and Loan (Klamath First), the largest consumer of title insurance for real property secured loans in Klamath County, Aspen's share has dropped. Using the number of recordings method, Aspen had a 41% share in the second half of 1984, a 30% share in 1985, and a 28% share in 1986.

Another measure of Aspen's declining market share is its business with the Oregon Department of Veterans' Affairs (DVA). DVA is an active mortgage lender in Klamath County. It never expresses a preference regarding a title insurer, but instead requires the borrower to make the selection. There is no question of defendants improperly influencing these transactions. Using the number of recordings method, Aspen's share of DVA transactions was 70% in the second half of 1984, 36% in 1985, and 25% in 1986. Using the gross premiums method, Aspen's share was 41% in the second half of 1984, 59% in 1985, and 35% for the first five months of 1987.

Several defendants are joined. Jeld–Wen, Inc. (Jeld–Wen) is an Oregon corporation with its headquarters and approximately 550 employees in Klamath County. It manufactures wood mouldings, windows and doors in various states throughout the United States. It has regularly purchased real property in Klamath County over the past decade, for development and for timber. Jeld–Wen has used Mountain's title insurance and closing services almost exclusively since 1979. Defendant Richard Wendt is its president and founder, and owns approximately 40% of its stock. Defendant Roderick Wendt, Richard Wendt's son, is its secretary.

Defendant Trendwest, Inc. (Trendwest) was spun off from Jeld–Wen in 1982. Jeld–Wen had entered the real estate development and home building businesses, and incorporated these, originally as Trendwest Development Co. and later as Trendwest. Its original capitalization was approximately $10,000,000. From the beginning, Trendwest used Mountain's title insurance and closing services almost exclusively. Trendwest and Jeld–Wen remain predominantly commonly owned and controlled, and their boards of directors include Richard Wendt and Roderick Wendt.

Defendant Trendwest Properties, Inc. (Trendwest Properties) is a real estate company and a 100% subsidiary of Trendwest. It primarily sells real estate owned by Trendwest.

Trendwest Capital Corp. (Trendwest Capital) is a venture capital firm. Trendwest owns 97.5% of Trendwest Capital. Trendwest Capital has purchased or acquired an interest in several Klamath Falls businesses: Camelot West, Apple Attractions of Oregon, Klamath Brick and Tile Company, Empire Building Supply, and Oliver Spires Nissan. Generally, Trendwest officers have served on or controlled the board of

directors of these companies following the investments.

Defendant South Valley State Bank (South Valley) is a state-chartered bank. It is smaller in assets or deposits than three of its local competitors: Klamath First, U.S. National Bank, and Ben Franklin Savings & Loan. However, it is the fastest growing bank in Klamath County. Its assets have grown from $4,000,000 in 1980 to approximately $45,000,000 presently. It makes many loans, for some of which title insurance companies are used.

Formerly, South Valley divided its business between Aspen, Klamath, and Mountain. Richard Wendt purchased 60% of South Valley's shares in June 1983. He selected three of the five members of South Valley's board of directors. In August 1983, Mountain took over South Valley's collection escrow accounts, at the instigation of Linda Stelle, Mountain's Klamath Falls operation manager. Thereafter South Valley began to do the largest share of its title insurance business with Mountain.

Defendant Allan Craigmiles has been the president of South Valley since April 1980. He is also a member of the board of directors of Trendwest Capital. He received a $25,000 loan from Richard Wendt and Trendwest in 1983 to allow him to personally invest in South Valley. About $6,000 remains outstanding on that loan.

Certified Mortgage Company (Certified) was in the business of making second mortgage loans to Klamath County residents and then brokering the loans to investors. It was also in the collection escrow business. It ceased operations in January 1987. Historically, Certified sent all of its title insurance business to Aspen and its predecessor, Transamerica Title, due to the close relationship between Richard Marlatt of Certified and Patterson and Addington of Transamerica Title. Aspen opened a collection escrow department in October 1984, placing itself in direct competition with Certified. Marlatt was unhappy about this, and cut back Aspen's share of Certified's title insurance business to one-third, sending the other two-thirds in equal portions to Klamath and Mountain. In January 1986, Marlatt learned that Aspen intended to name Certified as a defendant in this litigation. Certified then ceased giving any of its title insurance business to Aspen.

Mountain was previously the Klamath Falls division of Mountain Title Co., Inc., a company with headquarters in Medford. The owners of the Medford company were having financial difficulties, and Stelle approached Roderick Wendt in January 1985 about the possibility of purchasing the entire company or the Klamath Falls operation. In July 1985, a price was agreed upon for the purchase of the Klamath Falls operation by Trendwest. The transaction was closed on August 30, 1985. Trendwest purchased 75% of Mountain, Stelle purchased 21% and became the president of Mountain, and another managerial employee purchased the remaining 4%.

Mountain has used various motivational methods with its staff. In early 1986, Stelle set a goal of attaining 75% of the title insurance market, which was later scaled down to 60%. In September 1986, Stelle drew a thermometer-like chart with a goal of 100% marked at the top, representing payment of 100% of the loan owed by Mountain to Trendwest. Mountain has used a system of cash bonuses paid to employees when they lure business away from competing title companies. Also, Stelle has solicited Roderick Wendt, Robert Kent and Allan Craigmiles to use Mountain's title insurance and escrow services.

## DISCUSSION

### A. *Conspiracy Claim Under Section 1 of the Sherman Act*

Count I of Aspen's complaint is for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, which provides:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal.

A complaint under § 1 must show that (1) there was a contract, combination, or conspiracy; i.e., an agreement or concerted action toward a common goal, (2) the agreement unreasonably restrains trade, and (3) the restraint affected interstate commerce.

*T.W. Elec. Service v. Pacific Elec. Contractors,* 809 F.2d 626, 632–33 (9th Cir. 1987). Defendants contend that Aspen has failed to create an issue of fact as to the first two elements.

### 1. *The Existence of a Contract, Combination, or Conspiracy*

█ The essence of a Section 1 action is concerted rather than unilateral action. *Wilcox v. First Interstate Bank of Oregon, N.A.,* 815 F.2d 522, 525 (9th Cir.1987). There must be proof of a contract, combination or conspiracy in restraint of trade. *Id.* Plaintiff must present evidence that reasonably tends to prove that defendants had a conscious commitment to a common scheme designed to achieve an unlawful objective. *Id.* Direct evidence of conspiracy is not required, since conspiracy is rarely susceptible of direct proof. *Blair Foods, Inc. v. Ranchers Cotton Oil,* 610 F.2d 665, 671 (9th Cir.1980). Nor need an express agreement be proved. *Wilcox,* 815 F.2d at 525. An agreement may be inferred from circumstantial evidence of a common design and understanding, or a meeting of minds in an unlawful arrangement. *Id.*

However, evidence of conduct which is as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. *T.W. Elec.,* 809 F.2d at 632. To survive summary judgment, a plaintiff must present evidence which tends to exclude the possibility that the alleged conspirators acted unilaterally. *Id.*

█ Aspen relies heavily on a conversation at the Blue Ox restaurant between Patterson and Craigmiles to establish a conspiracy. Craigmiles told Patterson that 80% of South Valley's title and escrow services were being taken to Mountain. He reported that Richard Wendt had requested that South Valley use Mountain whenever possible.

Fed.R.Civ.P. 56(e) requires affidavits to be made on personal knowledge and to set forth facts as would be admissible in evidence. Hearsay is generally inadmissible as evidence. Fed.R.Evid. 802. Defendants contend that Wendt's alleged request is

hearsay. Plaintiff contends that it falls within the terms of Fed.R.Evid. 801(d)(2)(E):

> Statements which are not hearsay.—A statement is not hearsay if—
>
> ... (2) Admission by party-opponent.— The statement is offered against a party and is (A) his own statement, in either his individual or a representative capacity or ... (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

Craigmiles' account of the Blue Ox conversation is admissible against him and the company of which he is president, South Valley, under Rule 801(d)(2)(A). However, it does not tend to show any involvement by Craigmiles or South Valley in a conspiracy. Their concern to do business with those who do business with South Valley is as consistent with permissible competition as with illegal conspiracy, and does not tend to exclude the possibility of unilateral action on their part.

█ As to the other defendants, the alleged co-conspirators, the Blue Ox evidence is admissible only if it is admissible under Rule 801(d)(2)(E). *Filco v. Amana Refrigeration, Inc.,* 709 F.2d 1257, 1267 (9th Cir. 1983). To satisfy Rule 801(d)(2)(E), three elements must be proved: (1) that the declaration was in furtherance of the conspiracy, (2) that the declaration was made during the course of the conspiracy, and (3) that there is independent proof of the existence of the conspiracy and of the connection of the declarant and the defendant with it. *United States v. Perez,* 658 F.2d 654, 658 (9th Cir.1981).

The Blue Ox evidence does not satisfy element (1). Craigmiles' statements were to Patterson, the victim of the alleged conspiracy. As such, they would appear to be more a frustration of the conspiracy than a furtherance of it. *Cf. United States v. Muller,* 550 F.2d 1375, 1379 n. 3 (5th Cir. 1977) (the statement of a conspirator after he had been apprehended was not in furtherance of the conspiracy and therefore was inadmissible against a coconspirator). The evidence is inadmissible.

Even if element (1) was satisfied, plaintiff would have to establish a prima facie case by the introduction of substantial independent evidence. *Perez,* 658 F.2d at 658. Aspen points to a statement by attorney William Brandsness, South Valley's general counsel and a board member of Trendwest. In May 1986, Brandsness met with Patterson and Addington. In Addington's words:

[H]e presented to Andrew Patterson and me a letter of proposed settlement. He said he was acting on behalf of the defendants. The meeting ended with Mr. Brandsness calling us 'stupid,' shouting that he was going to bad mouth us all over town, and saying, 'we will put you out of business.' We had no doubt he spoke for all the defendants.

Aspen contends that this statement shows a specific intent by defendants to drive Aspen out of business.

Fed.R.Evid. 408 provides that evidence of furnishing or offering to furnish a valuable consideration in compromise of a claim is inadmissible, and that "Evidence of conduct or statements made in compromise negotiations is likewise not admissible." The Notes of the Advisory Committee explain that the primary policy of Rule 408 is the promotion of the public policy favoring the compromise and settlement of disputes. They state:

The practical value of the common law rule has been greatly diminished by its inapplicability to admissions of fact, even though made in the course of compromise negotiations, unless hypothetical, stated to be 'without prejudice,' or so connected with the offer as to be inseparable from it. ... An inevitable effect is to inhibit freedom of communication with respect to compromise, even among lawyers. Another effect is the generation of controversy over whether a given statement falls within or without the protected area. These considerations account for the expansion of the rule herewith to include evidence of conduct or statements made in compromise negotiations....

Weinstein's Evidence asserts that Rule 408, with its policy of full and frank disclosure by each party of its position, calls for excluding all statements made in settlement negotiations.

It should be assumed that the law has written over the door of every such conference room the words 'without prejudice.' The best hope of a satisfactory compromise lies in the confidence of the participants in the conference that they can speak freely.

2 Weinstein's Evidence ¶ 408[03] (citing Tracy, "Admissibility of Statements of Fact Made During Negotiation for Compromise," 34 Mich.L.Rev. 524, 529 (1936)).

■ Aspen contends that by the time Brandsness made his threat, the settlement conference should be deemed ended. I disagree. In effect, plaintiff asks me to determine the moment in time when the meeting turned from a genuine settlement discussion to a futile post-discussion argument. It is doubtful whether discussions always have such a clear breaking point. For example, to exit a room might be a negotiating ploy rather than a break-off of discussions. Even if a clear breaking point always existed, the courts may not be competent to make such a determination. The same policy considerations which establish the need for Rule 408 to cover all statements, establish the need to have settlement conferences in their entirety covered.

Full and frank discussions would be undercut were negotiators forced to ask themselves if their discussions had passed the point of futility. Since Brandsness' threat came during the course of a settlement discussion, and because I do not find the discussion closed at that time, I exclude evidence of the threat.

■ Aspen also relies on the motivational methods used by Mountain. These methods aim to encourage Mountain employees to seek a very high market share in the title insurance market. However, the intent to vanquish a rival in an honest competitive struggle cannot help to establish an antitrust violation. *Airweld, Inc. v. Airco, Inc.,* 742 F.2d 1184, 1192 (9th Cir. 1984). This is because the antitrust laws aim to protect competition, not competitors. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50

L.Ed.2d 701 (1977). All of Stelle's motivational methods are as consistent with legitimate competition as with a conspiratorial intent. Aspen itself emphasizes that the market for title insurance is derived, and that the market for providing title insurance is therefore zero sum; i.e., the advance of one title company must come at the expense of the others, since there is no way to increase the total demand for title insurance services. Mountain can therefore improve its success only by correspondingly hurting the success of its rivals: i.e., by competing. No implication of a conspiracy is created by Mountain's goal of attaining a high percentage of the market.

■ Finally, Aspen argues that the purchase of Mountain by Trendwest in January 1985 creates an inference of conspiracy. However, Trendwest had been using Mountain's title insurance services since 1979. The purchase did not add to Mountain's clientele.

In sum, there is no evidence which creates an inference of conspiracy aside from the Blue Ox conversation. That evidence is inadmissible except as to Craigmiles and South Valley, both because Craigmiles' statements were not in furtherance of the alleged conspiracy, and because there is no independent proof of the existence of the conspiracy.

■ There is no conspiracy as to certain defendants for another reason. A conspiracy requires two or more actors. A corporation cannot conspire with itself. Nor can the officers or employees of a single firm conspire with each other while pursuing the firm's interest. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 770, 104 S.Ct. 2731, 2741, 81 L.Ed.2d 628 (1984). Nor can a corporation conspire with one of its unincorporated divisions. *Id.* at 771, 104 S.Ct. at 2741. Similarly, a parent and its wholly owned subsidiary cannot conspire in violation of § 1. *Id.* at 772–73, 104 S.Ct. at 2742–43.

■ The logic of *Copperweld* has been properly extended to sister corporations, both of whom share wholly common ownership. *Century Oil Too., Inc. v. Production Specialities, Inc.*, 737 F.2d 1316 (5th Cir.1984). Some courts have gone further,

and held that a 51% owned subsidiary cannot conspire with its parent. *Novatel Communications v. Cellular Telephone Supply*, 1986–2 Trade Cas (CCH ¶ 67,412 (N.D.Ga.1986) [Available on WESTLAW, 1986 WL 15507]. Others have declined to make this extension, noting that a controlling shareholder having less than all shares might lack a unity of purpose and interest with the controlled corporation. *Sonitrol of Fresno, Inc. v. AT & T Co.*, 1986–1 Trade Cas (CCH 67,080 (D.D.C.1986) [Available on WESTLAW, 1986 WL 953]. I find *Sonitrol*'s reasoning more persuasive than *Novatel*'s, and rule that only corporations which are owned 100% in common, or a *de minimis* amount less than 100%, are covered by the *Copperweld* rule.

No conspiracy may lie as between Trendwest and Jeld–Wen. The Pretrial Order establishes that their ownership was entirely identical, and is substantially identical. Similarly, no conspiracies may lie as between Trendwest, Trendwest Properties, and Trendwest Capital, the latter two being wholly-owned subsidiaries of the former. I do not dismiss on this ground as to conspiracies between Trendwest, South Valley and Mountain, however. Richard Wendt owns only 60% of South Valley's stock, and Trendwest owns only 75% of Mountain's stock.

### 2. *Unreasonable Restraint of Trade*

■ Defendants argue alternatively that there is no issue of fact that they have unreasonably restrained trade. A plaintiff, to prevail on a § 1 conspiracy theory, must produce evidence of injury to competition in the marketplace caused by an anticompetitive agreement. *T.W. Elec.*, 809 F.2d at 635. There must be injury to competition, not just injury to a competitor. *Id.*

Defendants point to the fact that Aspen's market share has dropped as much in transactions not involving defendants as to those involving them. The record supports this assertion. See above, pp. —— – ——.

Aspen responds that it is not whether its market share has dropped in non-defendant transactions which is key, but rather whether defendants have foreclosed Aspen

from competing for certain business. It states that it has been foreclosed from even competing for the following orders:

| CUSTOMER | ALLEGED LOST TITLE ORDERS PER MONTH |
|---|---|
| South Valley | 7 |
| Certified | 6 |
| Silani | 1 |
| Brandsness | 3 |
| Town & Country | 4 |
| Holman/Coldwell Banker Realty | 4 |
| Chuck Fisher Realty | 2 |
| First Interstate Bank | 4 |
| TOTAL | 31 |

Defendants reply that, taking the facts in the light most favorable to plaintiff, at most a *de minimis* amount of the market has been foreclosed. I agree.

 Defendants contend that there is no evidentiary basis for finding that Aspen was foreclosed from doing business with Silani Realty, Holman–Coldwell Banker Realty, Chuck Fisher Realty or First Interstate. Aspen musters no evidence to the contrary. Rather, it vaguely argues:

The plaintiff's assessment is predicated on the realities of the pervasive power and influence of the Wendts and their corporations in Klamath Falls. As the only developer which during the lean years of the mid–1980s, was active in developing real estate in Klamath County, it would be ludicrous to ignore the inference that Trendwest's and its coconspirators' actions had no effect on realtors and lenders in Klamath Falls. Silani Realty does a substantial amount of work for Jeld–Wen. Hank Holman of Holman–Coldwell Banker Realty has recently become the only realtor other than Trendwest Properties that lists property from Trendwest's Harbor Isles development. (*See* C–1.) Chuck Fisher Realty has a large loan from South Valley ... and in 1985 Jeld–Wen obtained a million dollar mortgage from First Interstate Bank. (C–16.) Thus, if Aspen Title is receiving less business from these entities since Trendwest's acquisition of Mountain Title, it is neither surprising nor unrelated to the conspiracy, in that they all have a continuing connection to

and interest in pleasing the defendants or participating with the defendants. Memorandum in Opposition, pp. 46–47. Translated, the argument reads: (1) the Wendts are powerful, (2) these institutions have a motive to conspire with such powerful persons, therefore (3) one must infer a conspiracy. I find none of this evidence to be less consistent with permissible competition than with illegal conspiracy.

Nor is there adequate evidence as to Town & Country and Certified. Addington admits that Certified cut back its business to Aspen to one-third because Aspen began competing with it. See above, p. 1483. Also, she admits that Certified cut off all business in response to Aspen's decision to sue it. *Id.* at 1483. Similarly, she admits that Town & Country cut back its business to Aspen to one-third on account of this lawsuit being threatened against it. All of these actions are as consistent with unilateral action as with conspiracy.

 Only the orders of South Valley and Brandsness have been arguably foreclosed. Patterson asserts that Aspen would be entitled to no more than 30% to 40% of South Valley's orders. South Valley's orders have totaled 42 in 1984, 85 in 1985, and 117 in 1986. Taking the highest figures—117 orders and 40%—that would mean that Aspen could not expect more than 47 orders per year, or 4 per month. In fact, they have averaged about 9% of South Valley's business, so their alleged foreclosure is reduced to 3 orders per month.

As to Brandsness, he initiates the selection of title insurance companies no more than 18 times per year, or one and one-half times per month. Historically, he preferred Klamath, and more recently Mountain. Aspen cannot claim to have been foreclosed from more than one-third of his referrals, or 0.5 orders per month.

Patterson estimates that about 250 title orders are made per month in Klamath County. Thus, assuming that Aspen lost 3 orders per month from South Valley and 0.5 from Brandsness, that would constitute a foreclosure of 1.4% of the title orders.

If the gross premiums method is used, the result is not significantly different. Plaintiff estimates the orders from South Valley and Brandsness to be worth $265 per order. Thus, loss of 3.5 orders would constitute a loss of $928 per month. The total gross premiums for title insurance have been $564,522 in 1984, $572,546 in 1985, and $708,625 in 1986; i.e., an average of $615,231 per year or $51,269 per month. The foreclosed orders of $928 per month would constitute a loss of 1.8% of the gross premiums.

In sum, under either calculation, defendants' alleged conspiracy has foreclosed less than 2.0% of the market. This is inadequate as a matter of law to constitute a significant foreclosure. *Cf. Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 328, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1961) (3% foreclosure described as insufficient to injure competitor).

■ Plaintiff presents one argument for a *per se* violation of § 1: that defendants' alleged conspiracy constitutes an unlawful group boycott. *Per se* treatment applies only where the alleged boycotters have market power or exclusive access to an element essential to competition. *Rickards v. Canine Eye Registration Foundation*, 783 F.2d 1329, 1333 (9th Cir.1986).

■ Defendants lack market power. Using the number of recordings method, they constitute 6% of the market of those using title insurance services. Using the gross premiums method, they constitute 12%. This is inadequate.

Aspen points to the fact that Mountain's share of the market for those *supplying* title insurance is about 50%. This misses the point. The alleged group boycott is by defendants who are *consumers* of title insurance services against one of its *providers:* Aspen. It is the market power of the alleged boycotters which is relevant, not that of provider Mountain.

## B. *Tying Claim Under Section 1 of the Sherman Act*

■ Count III is for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, for tying. A tying arrangement occurs when a seller refuses to sell one product (tying product) unless the buyer also purchases another (tied product). *Robert's Waikiki U-Drive v. Budget Rent-A-Car*, 732 F.2d 1403, 1407 (9th Cir.1984). The essential characteristics of a tying arrangement lie in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 13, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984). No tie-in exists absent some form of forcing or coercion. *Id.* at 14–15, 104 S.Ct. at 1559–1560.

■ A tying claim has three elements: (1) a tie-in between two distinct products or services, (2) sufficient economic power in the tying product market to impose significant restrictions in the tied product market, and (3) an effect on a not-insubstantial volume of commerce in the tied product market. *Robert's Waikiki*, 732 F.2d at 1407.

■ Aspen attempts to show a tie-in by means of the affidavits of Marian Walker, Rosie Hall and Peggy O'Neill. Walker is a former South Valley loan officer. She states that South Valley began using only Mountain in late 1984, and that customers were often steered to Mountain without asking their preference in title insurance companies. "If the customer did happen to ask about title companies, the bank would say 'we use Mountain Title.'" Walter acknowledges that there was no forcing: "We would use another title company if the customer insisted."

Hall obtained a loan from South Valley in late 1985. She states:

3. No one from the bank ever asked me where I wanted to go for title insurance or closing. The loan ended up being closed by Mountain Title ... I would not have selected Mountain Title to close the loan or to provide title insurance because they had given both my sister and me unsatisfactory service before.

Significantly, Hall does not claim to have asked to use another title company, much

less to have been coerced into using Mountain.

O'Neill sold more than 4,000 acres to Trendwest Development in 1985. She wanted to use Aspen to perform both the title insurance and escrow closing services in the transaction. Aspen did provide the title insurance, despite Trendwest Development's desires to the contrary, so O'Neill was certainly not coerced as to the title insurance. Aspen did not close, however. This single transaction of forcing in the competitive escrow closing market, see above, p. 1481, even if true, would not constitute a tying violation. *Jefferson*, 466 U.S. at 17, 104 S.Ct. at 1560.

In sum, Aspen fails to present evidence creating an issue of fact that there was any coercion in either the title insurance market or the escrow closing market. Summary judgment on the tying claim is granted on this ground.

It is also granted on the ground that defendants lack economic power in the *tying* product market. The tying product market is the market for loans secured by real estate. Defendants have submitted affidavits and deposition portions showing that they lack power in this market, and Aspen has failed to supply contrary evidence. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552–53, 91 L.Ed. 2d 265 (1986).

I dismiss on a third ground: the alleged tie-in had an effect on an insubstantial volume of commerce in the tied product market. Taking the facts in the light most favorable to Aspen, less than 2% of the market has been foreclosed. See above, pp. 1486–1488.

Finally, I dismiss to the extent that defendants have been the purchasers of property or lenders of money secured by real property. Regardless of who pays for title insurance, it is the purchaser of the property and the lender who are insured by title insurance, and who are its real consumers and beneficiaries. *Cf. McGee v. First Federal Savings and Loan Association of Brunswick*, 761 F.2d 647, 648–49 (11th Cir. 1985).

### C. Conspiracy to Monopolize Claim Under Section 2 of the Sherman Act

■ Count II is in part for conspiracy to monopolize under Section 2 of the Sherman Act, 15 U.S.C. § 2. In order to establish a § 2 conspiracy, there must be a showing that more than one of the alleged co-conspirators had at least some awareness that the underlying conduct was anticompetitive or monopolistic. *Syufy Enterprises v. American Multicinema, Inc.*, 793 F.2d 990, 1000–01 (9th Cir.1986). The evidence in this action fails to show any such awareness of anticompetitive conduct. See above, pp. 1484–1486. I grant summary judgment as to the conspiracy to monopolize theory.

### D. Attempted Monopolization Under Section 2 of the Sherman Act

■ Count II also includes an attempted monopolization theory, under Section 2. Attempt to monopolize has four elements: (1) specific intent to control prices or to destroy competition, (2) predatory or anticompetitive conduct directed to accomplishing that end, (3) a dangerous probability of success, and (4) causal antitrust injury. *Syufy*, 793 F.2d at 998–99.

Aspen fails to raise an issue of fact that defendants acted with specific intent to harm competition. See above, pp. 1484–1486.

Aspen also fails to show causal antitrust injury, since less than 2% of the relevant market has been foreclosed. See above, pp. 1486–1488. On both of these grounds, I grant the motion for summary judgment on the attempt to monopolize claim.

### E. Section 7 of the Clayton Act

Count IV alleges that Trendwest's purchase of Mountain violated Section 7 of the Clayton Act, 15 U.S.C. § 18, which provides:

> No person engaged in commerce ... shall acquire directly or indirectly, the whole or any part of the stock or other share capital ... where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be

substantially to lessen competition, or to tend to create a monopoly.

■ Foreclosure of only a *de minimis* share of the market will not tend substantially to lessen competition. *Brown Shoe Co. v. United States*, 370 U.S. 294, 328–39, 82 S.Ct. 1502, 1525–31, 8 L.Ed.2d 510 (1962). Only a share of less than 2% is foreclosed in the present action, taking the facts in the light most favorable to Aspen. See above, pp. 1486–1488. This is a *de minimis* share. *Cf. Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 328, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1961).

Also of importance is the chronology of events. A price was set for the purchase of Mountain in July 1985. By that time, Aspen had already suffered most of its loss of market share. Aspen contends that most of its pre–July 1985 losses are nevertheless causally linked to the acquisition, because defendants had a motive to begin steering business to the company they would purchase. I find the argument unpersuasive. The opposite inference has at least equal force, i.e., that a prospective purchaser would not take actions to pump up the value of Mountain prior to setting the terms of the purchase.

■ In sum, there is no question of fact that a substantial lessening of competition resulted from the acquisition of Mountain, and summary judgment is due on that ground. It is also due for lack of antitrust injury.

In *Cargill, Inc. v. Monfort of Colorado, Inc.*, — U.S. ——, 107 S.Ct. 484, 93 L.Ed. 2d 427 (1986), the Supreme Court affirmed the requirement that a Clayton Act plaintiff allege an injury of the type the antitrust laws were designed to prevent. *Id.* 107 S.Ct. at 490. No action may lie for loss of profits due to the continuation of competition. *Id.* at 492. Nor may an action lie for losses due to an increase in competition. *Id.* Indeed, the antitrust laws encourage exactly the contrary result: vigorous competition. *Id.*

The court acknowledged the validity of a second theory of injury: that a merger would make possible an *independent* antitrust injury, in that case predatory pricing. *Id.* at 493. *Tasty Baking Co. v. Ralston Purina, Inc.*, 653 F.Supp. 1250 (E.D.Pa. 1987) built on this theory, and found that Continental's acquisition of the assets and liabilities of Drake was motivated by a desire to eliminate a competitor and was thus done with the intent to carry out an independent antitrust violation: attempted monopolization. Similarly, in *McCaw Personal Communications v. Pacific Telesis Group*, 645 F.Supp. 1166 (N.D.Ca.) 1986), plaintiff's purchase of the paging business was with the intent to use new-found market power to engage in the independent wrong of predatory price-cutting.

Here the acquisition of Mountain was not performed in order to facilitate the execution of an independent antitrust wrong. The acquisition was not part of a conspiracy to restrain trade. See above, pp. 1483–1484. Nor was Mountain acquired to facilitate an illegal tie-in. *Id.* at 1488–1489. It did not form part of a conspiracy to monopolize or an attempt to monopolize trade, either. *Id.* at 1489–1490. Consequently, the *Cargill* theory of an acquisition making possible an independent antitrust wrong is not applicable here, and summary judgment must be granted on the Section 7 claim.

### F. *Intentional Interference with Contractual Relations*

Count V of Aspen's complaint is a pendent claim for intentional interference with contractual relations. It is based on pendent jurisdiction.

■ The elements of this tort are: (1) defendants intentionally interfered with an existing or proposed contractual relationship, (2) they interfered either with an improper motive or by using improper means, and (3) as a result, plaintiff was damaged beyond just the fact of the interference itself. *Ron Tonkin Gran Turismo v. Wakehouse Motors*, 46 Or.App. 199, 208, 611 P.2d 658 (1980). Improper means include violation of a statute or regulation or recognized rule of common law, or the making of threats or false statements. *Top Service Body Shop v. Allstate Ins. Co.*, 283 Or. 201, 209–11, 582 P.2d 1365 (1978).

Aspen has raised a material issue of fact as to improper means. While it has not done so by its allegations of antitrust violations, it has by virtue of certain allegations of falsehoods. Aspen alleges that Brandsness and Craigmiles have misrepresented to South Valley customers and to Klamath Falls realtors that Aspen has been delaying the closing of transactions when in fact delays were the fault of South Valley. It also alleges that Stelle misrepresented to Beverly Smith, then an employee of Certified Mortgage, that Aspen was demeaning her work by means of a newspaper advertisement. Also, Aspen contends that Stelle misrepresented that Aspen improperly obtained collection escrow files from Certified.

Defendants argue that there is no fact issue that Aspen has not suffered damages from these alleged wrongs. On the evidence before me, I do not agree. It cannot be ruled as a matter of law that no part of the recent decline of Aspen's market share in the title insurance business is due to the alleged misrepresentations. There is an issue of fact whether the alleged misrepresentations have harmed the reputation of Aspen, and contributed to its losses. I therefore decline to grant summary judgment on this claim.

Nevertheless, I dismiss this claim because its sole jurisdictional basis is pendent. Because all of the federal counts have been dismissed, all that remains is the state-law claim in its non-antitrust dimension. I find no purpose served in continuing to exercise jurisdiction over this action. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

CONCLUSION

Counts I, II, III and IV are dismissed on summary judgment, for the reasons stated above. Count V is dismissed because no purpose is served in continuing to exercise pendent jurisdiction.